**In re STRATFORD ASSOCIATES
LIMITED PARTNERSHIP,
Debtor.**

**Bankruptcy No. 91–12309.**

United States Bankruptcy Court,
D. Kansas.

Sept. 21, 1992.

William H. Zimmerman, Jr., Royce E. Wallace, Wallace & Zimmerman, Wichita, Kan., for debtor.

Dennis R. Dow, Todd W. Ruskamp, Shook, Hardy & Bacon, Kansas City, Mo., Robert E. Nugent III, Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita, Kan., for Travelers Ins. Co.

W. Thomas Gilman, Redmond, Redmond & Nazar, Wichita, Kan., for Metro North Bank.

## MEMORANDUM OF DECISION DENYING DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION

JOHN K. PEARSON, Bankruptcy Judge.

This matter is before the Court on confirmation of Stratford Associates Limited Partnership's ("debtor") Second Amended Plan of Reorganization ("Plan") and Travelers Insurance Company's ("Travelers") objection thereto. The debtor appears by William H. Zimmerman, Jr. and Royce E. Wallace of Wallace & Zimmerman, Wichita, Kansas. Travelers appears by Dennis R. Dow and Todd W. Ruskamp of Shook, Hardy & Bacon, Kansas City, Missouri, and Robert E. Nugent III of Morris, Laing, Evans, Brock & Kennedy, Wichita, Kansas.

Metro North Bank appears by W. Thomas Gilman of Redmond, Redmond & Nazar, Wichita, Kansas.

## JURISDICTION

The Court has jurisdiction over this contested confirmation proceeding. 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(b)(2)(L).

## NATURE OF THE CASE

This is a typical "single asset" Chapter 11 case involving a limited partnership formed to acquire two related apartment complexes in Wichita, Kansas. The debtor encountered financial difficulties from the very outset and eventually failed to seek an extension of the maturity of the loan from Travelers used to acquire the property. Travelers commenced foreclosure proceedings and the debtor sought refuge in Chapter 11. The Court denied confirmation of the debtor's original plan. Debtor seeks to confirm its second plan of reorganization which proposes to pay all creditors in full with interest. Travelers has rejected the Plan and filed numerous and detailed objections to the confirmation of the Plan as proposed. Factually, Travelers asserts that the Plan is not feasible and that the interest rate proposed in the Plan is not adequate. Legally, Travelers asserts that the Plan unfairly discriminates and is not fair and equitable. All other creditors have accepted the Plan and virtually all limited partners have accepted the Plan.

For the reasons discussed below, the Court denies confirmation of the Plan.

## FACTS

The uncontested facts are:

1. Stratford Associates Limited Partnership was formed in 1983 under Connecticut law. At the time of formation, Richard Roberts Co., Inc., ("RRC") and Robert H. Haines III were the general partners. There were thirty-nine limited partners. The debtor acquired Stratford East and Stratford West (hereafter "the properties"), two apartment complexes in Wichita,

Kansas, containing 182 apartments originally constructed in 1968.

2. The properties were operated by Richard Roberts Management Services, Inc. ("RRMS"), an affiliate of RRC between 1983 and 1991. On December 12, 1991 the Court, on motion of the debtor, approved a management agreement between the debtor and Westford Asset Management, Inc. ("Westford"). Westford took over actual management of the properties from RRMS on August 1, 1991. RRMS, along with RRC, are affiliates of the Richard Roberts Group, Inc., ("RRG").[1]

3. Although Westford has taken over management of various RRG properties and entities, it has not paid or promised to pay any of the RRG entities any consideration.

4. Travelers provided the acquisition loan for the debtor's purchase of the properties. The debtor encountered cash flow problems virtually from the outset and at one point was in default under the term of the loan agreement.

5. The original Travelers' loan matured on July 1, 1990 and the debtor negotiated a one-year extension of the maturity until July 1, 1991. The extension agreement also provided for an additional one-year extension at the debtor's option upon payment of a loan fee of $25,000.00. The debtor did not exercise its option and on July 1, 1991, the loan matured. Travelers commenced foreclosure proceedings in state court and sought the appointment of a receiver to collect rents and manage the properties. In response, the debtor commenced this Chapter 11 case on July 10, 1991.

6. The parties have jointly retained F. Lee Jones, MAI, to appraise the properties. The parties have stipulated that the Jones' Appraisal, dated January 2, 1992, represents the market value of the properties. Jones appraised the properties at $3,590,-000.00.[2]

7. Travelers holds a first lien on the properties, and for Plan purposes, that claim was estimated at approximately $3,600,000.00. This claim is still disputed. Travelers has not filed a proof of claim, but in its objection to the Plan, Travelers asserts that as of July 10, 1991, the date of the petition, its claim totaled $3,616,610.37.

8. Metro North has a second lien on the properties securing a claim of $282,024.64.[3]

9. As proposed, the Plan contains six classes of creditors all of whom are impaired. These classes and the treatment of the creditors therein are as follows:

Class 1 includes only Travelers' claim.[4] According to the Plan, Travelers' allowed claim is to be paid "on a twenty-five (25) year amortized basis and shall bear interest at 8.5% per annum; debtor's obligation to Travelers shall balloon five (5) years from the Effective Date of the Plan and be paid in full at that time." Additionally, the debtor is to be allowed a fifteen-day grace period in which to make the Travelers' payments. Under the Plan, the effective date is the earlier of sixty days after the confirmation hearing date or when all funds have been paid in by the limited partners.

Class 2 includes only Metro North's claim. Metro North's claim is to be "paid on an interest only basis at the rate of 7%

---

1. Throughout the many hearings in connection with this case the various Richard Roberts' entities have been mentioned, but never actually appeared. The various entities have apparently encountered financial difficulties of their own and, according to one witness, remain in existence, but merely as shells. Westford was formed to take over management, or as general partner of several of the limited partnerships originally managed by Richard Roberts' entities.

2. The parties have apparently operated from the beginning on the assumption that the actual value was at least equal to the Travelers' debt. The debtor and Travelers initially entered into a

duly noticed cash collateral order which provided for interim interest payments from the debtor's net cash flow.

3. "Secured" in this context is something of a misnomer as the property is worth less than Travelers' debt. Under 11 U.S.C. § 502, Metro North has no secured claim.

4. The Plan does not expressly separate Travelers' secured and undersecured portions of its claim into separate classes, apparently because of the assumption at the outset that Travelers was fully secured.

per annum in sixty (60) monthly payments commencing on the Effective Date." Sixty-one months after the effective date, Metro North's claim is to be paid in full. Debtor is also granted a fifteen-day grace period in which to make the Metro North payments.

Class 3 includes only the limited partners' claims based on unsecured promissory notes executed by the debtor. These claims are to be converted to limited partnership equity positions which, when combined, will equal 1.86% of the total limited partnership interest in the debtor.

Class 4 includes all general unsecured claims which are estimated to total $54,015.43. Class 4 creditors are to receive 100% of their claim with interest at 6% per annum, no later than one year after the effective date of the Plan.

Class 5 includes the interests of the limited partners who, in return for the infusion of additional capital will retain their interests. Partners who do not put up additional capital receive nothing in the Plan.[5]

Class 6 includes all the claims of the Richard Roberts' entities. These claims shall be converted to a 10% limited partner equity interest. Additionally, this class includes any claim on account of a third mortgage held by RRC which will be treated as an unsecured obligation in this class.

10. Travelers' claim is estimated, for the purposes of this opinion only, at $3,616,610.37. Of that amount an estimated $3,590,000.00 is secured and $26,610.37 is unsecured. There has been no accounting for payments made by the debtor during the pendency of this case under the agreed cash collateral order.

11. Travelers has not filed an unsecured claim, but did submit a ballot as an unsecured creditor in Class 4, in the amount of $26,610.37, rejecting the Plan.

12. Unsecured creditors in Class 4, holding eleven claims in the amount of $24,455.87, voted timely to accept the Plan.

13. The plan as proposed is feasible.

CONCLUSIONS OF LAW

14. All classes except Class 1 and 4 have voted to accept the Plan.

15. The debtor's classification scheme is not improper.

16. Substitution of Old Farms Management as the general partner of the debtor is consistent with the interests of creditors and public policy.

## DISCUSSION

■ In order to confirm a Chapter 11 plan, the Court must find that all subparts of 11 U.S.C. § 1129(a) have been met. However, if all the provisions of § 1129(a) except (a)(8) have been complied with, the plan may still be confirmed under the so-called cramdown provisions of § 1129(b). *In re Cantonwood Associates Ltd. Partnership*, 138 B.R. 648, 652 (Bankr.D.Mass. 1992). In either instance, the proponent of the plan has the burden of producing evidence that the statutory requirements for confirmation are met. *In re Apple Tree Partners, L.P.*, 131 B.R. 380, 393 (Bankr. W.D.Tenn.1991); *In re Revco D.S., Inc.*, 131 B.R. 615, 620 (Bankr.N.D.Ohio 1990).

Travelers has objected to the Plan contending that it fails to satisfy the requirements set forth in § 1129(a)(1), (5), (8), (10), (11), and (b)(2). The debtor has responded. The Court will deal with the objections seriatim.

## CLASSIFICATION OBJECTION

■ Travelers objects to the debtor's classification scheme which places Metro North in a class separate from general unsecured creditors. It also asserts an unsecured claim which it voted against the plan.

Travelers' objection may lead to a circular argument: The objection is based on the debtor's creation of two classes of unsecured creditors apparently based on the assumption that Travelers was fully

---

**5.** The additional capital will be used to fund the Plan and make necessary repairs, etc. In the event that the limited partners do not buy back in, other investors will purchase the interests offered.

secured and that Metro North would reassert its § 1111(b) election. The debtor counters that Travelers was not included in the general class of unsecured creditors. The Court disagrees. Travelers' vote in the general class causes the class to reject under 11 U.S.C. § 1126(c). However, if the Court sustains the objection both Travelers and Metro North must be in the unsecured class and, assuming that Metro North again accepts, its claim controls the whole class, which then would accept under § 1126(c)! [6]

On the facts known to the debtor at the time the plan was drafted, the Court can discern no improper motive and, therefore, it must overrule the objection.

To begin the discussion of classification of claims under the Bankruptcy Code the Court must first look to the plain meaning [7] of the language used by the debtor in drafting its plan. While perhaps artificially complicated, the plain meaning of the plan language clearly carves out of the general mass of unsecured creditors specific and clearly identifiable subclasses, leaving, as a sort of residuary clause, a general body of unsecured claims. The Plan provides, Class 1 "consists of the allowed claim of Travelers Insurance Company against the debtor." Class 2 "consists of the Metro North State Bank claim in the amount of $282,024.64." Class 3 "consists of limited partners' note claims arising from funds lent by certain limited partners to the debtor in 1990." Class 4 "consists of general unsecured debts." The Plan goes on to state: "Debtor has scheduled general unsecured debts totalling $54,015.43."

Although the Plan language does not contain the artificial embellishments so beloved by lawyers, it clearly establishes classes of creditors by either identifying the sole member, or by defining membership by type of claim held. Class 4 includes all unsecured creditors who are not separately classified. The grammatical analysis offered by the debtor is insupportable. The language that the debtor has

*scheduled* certain amounts neither modifies nor limits Class 4 in any fashion.

Travelers is entitled to an unsecured claim and has tendered a ballot in the amount of $26,610.37, against the Plan. Under 11 U.S.C. § 1126, simple mathematics compels the conclusion that Class 4 has rejected the Plan inasmuch as $26,610.37 out of a total of $51,066.24 in claims timely voted have voted to reject. Clearly more than one-third of the dollar amounts actually voted on the Plan have rejected the Plan. 11 U.S.C. § 1126.

Travelers also asserts that the Plan improperly separates the "unsecured claimants" into three separate classes, 2, 3, and 4. As support, Travelers contends that 11 U.S.C. § 1122(a) requires similar claims to be placed in the same class. To a certain extent, Travelers' argument is self defeating: if all the unsecured claims were in a single class, the class would have voted to accept and the proper ratios for confirmation obtained as Metro North's acceptance would result in the single massive class having accepted the plan. The Court must deal with the plan as drawn, however. Moreover, at the time the plan was drawn, the parties all assumed the property was worth at least as much as Travelers' debt, and Metro North has elected against the prior plan under § 1111(b).

Claims classification is governed by 11 U.S.C. § 1122 which provides in relevant part:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

---

**6.** Moreover, acceptance by the general unsecured class obviates the need for a ruling on Travelers' fair and equitable argument.

**7.** The plain meaning that counts is that found by the last judge in the system to review it.

The starting point for interpretation of any statute is with the language itself. *Mallard v. U.S. District Court for Iowa*, 490 U.S. 296, 300, 109 S.Ct. 1814, 1817–18, 104 L.Ed.2d 318 (1989); *United States v. Ron Pair Enterprises*, 489 U.S. 235, 240–41, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290 (1989). A significant number of courts have noted that on its face, § 1122(a) does not prohibit the separate classification of similar claims. Rather, it only prohibits the placement of dissimilar claims in the same class. *See Matter of Greystone III Joint Venture*, 948 F.2d 134, 139 (5th Cir. 1991); *Matter of Jersey City Medical Center*, 817 F.2d 1055, 1061 (3d Cir.1987); *Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1313 (8th Cir.1987); *Matter of LeBlanc*, 622 F.2d 872, 879 (5th Cir.1980); *reh'g denied, Brinkley v. Chase Manhattan Mortgage and Realty Trust*, 627 F.2d 239 (5th Cir.1980), and *Matter of LeBlanc*, 627 F.2d 239 (5th Cir.1980). *See generally*, Rusch, *Gerrymandering the Classification Issue in Chapter Eleven Reorganizations*, 63 U.Colo.L.Rev. 163 (1992). However, courts have not agreed on whether separate classification is permissible.

One line of cases requires that all substantially similar claims be classified together. *See In re Valrico Square Ltd. Partnership*, 113 B.R. 794, 795 (Bankr. S.D.Fla.1990); *In re Waterways Barge Partnership*, 104 B.R. 776, 784–85 (Bankr. N.D.Miss.1989). However, the majority of courts accept the separate classification of similar claims so long as such classification is based on legal or factual distinctions and is not for the purposes of gerrymandering the voting on the plan. *In re Lumber Exchange Building Limited Partnership*, 968 F.2d 647 (8th Cir.1992); *In re Bryson Properties XVIII*, 961 F.2d 496, 502 (4th Cir.1992); *Matter of Greystone III Joint Ventures*, 948 F.2d 134 (5th Cir.1991); *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir.1990); *In re ARN LTD. Limited Partnership*, 140 B.R. 5, 9 (Bankr.D.Colo.1992); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714, 715 (Bankr.S.D.N.Y. 1992), *aff'd*, 140 B.R. 347 (S.D.N.Y.1992); *In re Briscoe Enterprises Ltd. II*, 138 B.R.

795, 808 (N.D.Tex.1992); *In re Cantonwood Associates Ltd. Partnership*, 138 B.R. at 654; *In re General Homes Corp.*, 134 B.R. 853, 863 (Bankr.S.D.Tex.1991); *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1003 (Bankr.D.Mass.1991). *Compare Bjolmes*, 134 B.R. at 1003 (undersecured creditor's unsecured claim is legally distinct from general unsecured claims as it is created by reason of § 1111(b)); *In re Triple R. Holdings, L.P.*, 134 B.R. 382 (Bankr. N.D.Cal.1991) (same) with *Greystone*, 948 F.2d at 139 (rejecting § 1111(b) argument), and *Lumber Exchange*, 968 F.2d 647 (same), and *Cantonwood Associates*, 138 B.R. at 654 (same). *See also Greystone*, 948 F.2d at 139 (trade creditors may be separated from unsecured if necessary to "maintain future operations"); *Hanson*, 828 F.2d at 1313 (same); *Lumber Exchange*, 968 F.2d 647 (same).

At trial neither party presented evidence tending to indicate whether the separate classification was for gerrymandering purposes. Given the general assumption that Travelers had no unsecured claim and the prior § 1111(b) election by Metro North, the Court cannot discern an improper motive. Given those same assumptions, separate classification of Metro North was appropriate. *See* Rusch, *Gerrymandering the Classification Issue in Chapter Eleven Reorganizations*, 63 U.Colo.L.Rev. 163 (1992) (setting out hypothetical facts of a typical cramdown case).

Under these facts, the Court cannot conclude that the debtor sought to gerrymander the voting. The Plan complies with 11 U.S.C. § 1129(a)(1).

## CHANGE IN OWNERSHIP

Travelers objects to the plan provision substituting Old Farms Management, Inc. for the existing general partners of Stratford, Robert H. Haines III and RRC, asserting that the Plan does not comply with the provisions of 11 U.S.C. § 1129(a)(5)(ii), because the Plan fails to disclose how the substitution is consistent with the interests of creditors and public policy and that such substitution complies

with the terms of the Stratford Partnership agreement.

Section 1129(a)(5)(A)(ii) requires the proponent of the plan prove that "the appointment to ... such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy." On numerous occasions, Travelers has sought to prove that Westford Asset Management Co., Inc., would be inappropriate to manage the debtor. Westford Asset's president and sole shareholder is James M. Durham, who is also the sole shareholder and president of Old Farms. Travelers has sought to prove that Westford is a mere shell of the now substantially defunct RRMS. Moreover, Travelers has introduced evidence indicating that some former employees of the RRMS are now employed by Westford, presumably to indicate RRMS controls Westford.

Based on this same rationale, yet applying it to Old Farms and RRC, Travelers believes the substitution of Old Farms for RRC is somehow against public policy. The Court is unpersuaded. All the evidence at all the hearings suggests that Old Farms is an independent company with the necessary experienced personnel to manage the reorganized debtor. Old Farms' officers are James M. Durham, president, and Wayne P. Janczewski, secretary. Although Janczewski was previously employed by RRMS, he was not a principal of RRMS. The substitution of Old Farms as general partner for Stratford will not require any compensation or consideration be paid to either RRC or Robert H. Haines, president of RRG.

Durham has substantial experience in financial and management matters. Old Farms is presently the general partner in other limited partnerships. Old Farms is an independent entity which does not participate in a fee arrangement with RRC. Travelers offers no evidence that the proposed substitution somehow violates public policy. It simply argues that the fact that Old Farms employs former employees of that now defunct general partner, there is some vague public policy violation. The Court is satisfied that on the evidence be-

fore it, the substitution of Old Farms as general partner is in the best interest of the creditors and not against public policy.

■■■ Travelers asserts that the debtor has failed to show that the proposed substitution of Old Farms as general partner is in accordance with the Stratford partnership agreement. *In re Sovereign Group*, 88 B.R. 325, 330–31 (Bankr.D.Colo.1988). Travelers has not provided the Court with a copy of the partnership agreement; a document essential to any argument which asserts that an act violates such agreement. The mere assertion of an argument without supporting documentation does not warrant denial of confirmation. *See In re Mortgage Inv. Co. of El Paso, Tex.*, 111 B.R. 604, 612 (Bankr.W.D.Tex.1990) (without evidence tending to indicate that appointed individual would be unfit to manage debtor, "the Court will not find him inappropriate"); *In re Sherwood Square Associates*, 107 B.R. 872, 878 (Bankr.D.Md. 1989) (although no evidence presented tending to indicate that continuance would be in best interests, fact that debtor has improved under management sufficient). Even though the proponent of a plan bears the burden of proving each element under 11 U.S.C. § 1129(a), an objecting party has the initial burden of demonstrating the validity of its position. *See In re Revco D.S., Inc.*, 131 B.R. at 620, n. 3; *In re Future Energy Corp.*, 83 B.R. 470, 481, n. 21 (Bankr.S.D.Ohio 1988) (same). As Travelers failed to introduce the partnership agreement or any other evidence in support of its objection, the Court overrules the objection. The Plan satisfies 11 U.S.C. § 1129(a)(5).

### ALL CLASSES ACCEPT OR ARE NOT IMPAIRED

Travelers asserts that the Plan fails to comply with 11 U.S.C. § 1129(a)(8) requirement that all classes of claims either accept or be unimpaired. The Court has already concluded that neither Class 1, consisting of Travelers' secured claim, nor Class 4, consisting of the unsecured claims, has accepted. Both classes are impaired. However, as the Plan proponent is seeking con-

firmation under the cramdown provision of § 1129(b), the requirement of § 1129(a)(8) need not be met. *See* 11 U.S.C. § 1129(b)(1).

## ACCEPTANCE BY ONE CLASS

■ Travelers contends that the requirements of 11 U.S.C. § 1129(a)(10) have not been met in that there are no impaired classes which voted to accept the Plan. Class 2, consisting of Metro North's claim, is impaired and has accepted. *See* Certificate of Voting filed May 18, 1992.

## FEASIBILITY OF PLAN

Travelers asserts the Plan is not feasible and therefore not confirmable. 11 U.S.C. § 1129(a)(11). According to Travelers, several cost/expense factors were not incorporated in the debtor's projections of income and expenses. While not inclusive, such factors include the debtor's low estimation of repair expenses, the failure to provide full payment of Travelers' and Metro North's claim,[8] the debtor's failure to take into account changes in real estate taxes which will be owed, the increased debt service (assuming the debtor is required to provide an interest rate greater than 8.5% as proposed in the Plan), the ability to obtain the Plan's proposed cash infusion from limited partners, and the financial performance of the debtor since the filing of the bankruptcy petition.

■ 11 U.S.C. § 1129(a)(11) provides that the Court shall only confirm a plan if confirmation is not likely to be followed by liquidation. Thus, a plan must be feasible. However, feasibility "does not require that substantial consummation of the plan be guaranteed; rather, the plan proponent must demonstrate that there be a reasonable assurance of compliance with plan terms." *In re Orlando Investors, L.P.*, 103 B.R. 593, 600 (Bankr.E.D.Pa.1989). *See also Matter of King Resources*, 651 F.2d 1326 (10th Cir.1980) ("[f]easibility means that the reorganized company will emerge from the proceeding in a solvent condition with reasonable prospects of financial stability and success").

The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promises creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.

*In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir.1985), quoting *Matter of Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir.1985).

Courts have identified the following factors as pertinent:

"the prospective earnings of the business or its earning power; the soundness and adequacy of the capital structure and working capital for the business which the debtor will engage in post-confirmation; the prospective availability of credit; whether the debtor will have the ability to meet its requirements for capital expenditures; economic and market conditions; the ability of management, and the likelihood that the same management will continue; and any other related factors which would materially reflect on the company's ability to operate successfully and implement its plan."

*In re Kemp*, 134 B.R. 413, 416 (Bankr. E.D.Cal.1991) quoting *In re Texaco, Inc.*, 84 B.R. 893, 910 (Bankr.S.D.N.Y.1988), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y.1988). *See also Matter of Holiday Associates Ltd. Partnership*, 139 B.R. 711, 717 (Bankr.S.D.Iowa 1992); *In re Guilford Telecasters, Inc.*, 128 B.R. 622, 627 (Bankr. M.D.N.C.1991); *In re Sovereign Oil Co.*,

---

8. Travelers' objection appears to be based on the Plan's providing that Metro North's claim is $282,024.64. According to Travelers, Metro North's claim is $278,872.00, the difference being represented by the allowance of postpetition interest on Metro North's claim. Obviously, Metro North would not normally be entitled to receive postpetition interest as it is unsecured. 11 U.S.C. § 506(b). However, the Plan asserts that $282,024.64 is the amount of Metro North's claim as of the date the petition was filed. While the Plan does provide that Metro North will receive postpetition interest on its claim, a provision not warranted under existing law, such an objection would have been better framed as an objection to Metro North's claim pursuant to 11 U.S.C. §§ 502 and 506. It is noted that the debtor has modified its stance as to Metro North's claim. Exhibit 1 reflects that Metro North's claim is now $305,917.58.

128 B.R. 585, 586 (Bankr.M.D.Fla.1991); *In re Temple Zion*, 125 B.R. 910, 915 (Bankr. E.D.Pa.1991). The Court concludes that the plan is feasible.

The objections, as presented in Travelers' brief will be dealt with sequentially.

### REPAIR EXPENSES

■ Travelers asserts that the debtor has understated the cost for necessary yearly repairs to the structures. Relying exclusively on the appraisal of F. Lee Jones, Travelers determined that $145,-500.00 was necessary for repairs and maintenance for the year 1992. *See* Exhibit I Appraisal of Stratford West Apartments, p 205 (East Appraisal) and p 212 (West Appraisal). In comparison, the debtor's proposed operating expenses for 1992 for maintenance and repairs is projected to be $37,500.00 [9] leading Travelers to conclude that the Plan is not feasible. *See* Debtor's Exhibit 1.

The evidence presented at trial indicates that Travelers' conclusion is based on faulty calculations and assumptions. Travelers introduced evidence of its conclusion through the testimony of Sally M. Jensen, a financial expert. In turn, Jensen referred and based her testimony on a pro forma prepared by her and her staff. *See* Exhibit F. In preparing the pro forma, Jensen adopted certain figures from the Jones' appraisal, including the repairs and maintenance determinations. In doing so, however, Jensen failed to see the entire picture.

The debtor's pro forma projects operating expenses of $535,000.00 for the year 1992. *See* Exhibit 1. However, this figure does not take into account a capital improvements expenditure of $30,000 for year 1992. Therefore, according to the debtor, 1992 operating expenses and capital improvements equal $565,000.00. In comparison, the Jones' appraisal provides that total operating expenses for both properties for year 1992 will be $546,400.00 ($353,155.00

+ $193,245.00). The Jones' appraisal also includes over $20,000.00 for "Reserve for Replacement," necessitating the inclusion of the debtor's proposed capital improvements into the debtor's operating expense determination.[10] Overall, both the debtor's and Jones' proposed operating expense are relatively equal, with the debtor's figures being slightly higher. While there are certain differences in allowances and amounts, a fact which Travelers failed to recognize, a pie is still a pie no matter how you slice it. The debtor has not underestimated the cost of repairs and improvements.

### PRO FORMA'S PROJECTION OF DEBT SERVICE

Travelers asserts that the pro forma attached to the Plan underestimates the funds necessary to service both Travelers' and Metro North's debt. Further, Travelers argues that the pro forma fails to reflect Travelers' unsecured claim as being paid under the heading "Prepetition Trade Liabilities," and that Metro North's claim has been underestimated.

Debtor's Exhibit 1, submitted during trial, is a revised pro forma. It takes into account these changes and still reflects a positive cash flow.

### REAL ESTATE TAXES

■ Travelers contends that the Plan fails to reflect the actual real estate taxes paid by Stratford during the year 1991. According to Stratford, the 1991 taxes were $82,832.00. Debtor's Exhibit 1 reflects the changes as proposed by Travelers. Travelers also contends that the debtor has underestimated taxes for the next five years.

For the year 1991, the debtor estimated taxes of $82,800.00. For the year 1992, the debtor estimates taxes to be $77,900.00. Each year subsequent to 1992, the debtor has projected increased taxes. While there is a projected decrease in taxes from 1991

---

**9.** An exhibit attached to the Plan proposed operating expenses of $34,000.00 for 1992. However, the Court will conform the Plan and arguments to the evidence presented at trial.

**10.** Although Jones uses the phrase "Reserve for Replacement," this apparently has the same meaning as debtor's "Capital Improvements."

to 1992, the debtor has adequately explained that under the new tax laws, the debtor can expect to pay less taxes. The evidence supports that the debtor has properly considered all factors in making its projections of taxes. Travelers presented no evidence to support a contrary conclusion.[11]

## PROPOSED INTEREST RATE

Travelers next contends that if the proposed interest being paid to service Travelers's debt were increased from 8.5% to 9%, the increased payments would render the Plan unfeasible. This issue is properly addressed in the discussion involving 11 U.S.C. § 1129(b) below. The Court's finding that 8.5% is a reasonable rate negates any need to discuss feasibility under a hypothetical interest rate of 9%.

## CASH INFUSION

■ Although Travelers questions the feasibility of the Plan as it relies extensively on the debtor's receipt of $247,800.00 from the limited partners, it presented no evidence to contradict debtor's testimony that the investment would be forthcoming. The Plan requires that, upon approval of the disclosure statement, the debtor would solicit from the existing limited partners and the substitute general partner, Old Farms, additional cash investment. Projected investments from limited partners are to total $247,800.00, and Old Farms is to invest $2,500.00. If a limited partner chooses not to invest, Old Farms or its designee is allowed to contribute that limited partner's share in exchange for ownership of that interest. Limited partners who fail to contribute, retain or receive no interest in the surviving debtor. Without capital infusion, the plan is not feasible.

■ Generally, without proper funding in place or a firm commitment of such funding, the Court cannot find the plan feasible. *In re ARN LTD. Ltd. Partnership*, 140 B.R. at 14 (plan not feasible because debtor failed to prove purchaser

could or would perform); *Matter of Holiday Associates Ltd. Partnership*, 139 B.R. at 717 (letters of intent were not sufficient to prove financing was available, rather firm commitment or guarantee was necessary); *In re Sovereign Oil Co.*, 128 B.R. at 586–87 (debtor's expectation of receipt of additional monies not sufficient where neither written contract nor letter of commitment provided).

During trial, evidence was presented which indicated that financing was available. James Durham, president of Old Farms, indicated that he has received seven purchases out of a required thirty-five limited partnership offers extended. Further, according to Durham, others have agreed to buy. When questioned about these supposed purchases, Durham revealed that he was in possession of a check from a prospective purchaser, Robert Foisie, which would cover the entire amount necessary to fund the Plan, $247,800.00. Absent contrary testimony, Durham's testimony is sufficient to support the Court's conclusion that the money is available.

## STRATFORD'S FINANCIAL PERFORMANCE POSTPETITION

■ Travelers' final feasibility objection relates to the debtor's postpetition performance. According to Travelers, Stratford's postpetition monthly earnings reveal that it would not be able to service Travelers' debt at approximately $30,000.00 per month. As support, Travelers notes that it has received approximately $16,250.00 per month from the debtor as adequate protection—well below the proposed payments.

Past performance may be considered, but is not controlling. The Court is satisfied from the uncontroverted testimony of Durham that the debtor will be able to service its debt.

## FAIR AND EQUITABLE AND UNFAIR DISCRIMINATION UNDER CRAMDOWN

Under the cramdown provisions of 11 U.S.C. § 1129(b), the Court cannot confirm

---

**11.** Although not in the evidence presented to the Court, the taxes for education are projected to go down in the next year in Kansas.

a proposed plan where an impaired class has not accepted unless "the plan does not discriminate unfairly [12], and is fair and equitable, with respect to each class of claims or interest that is impaired under, and has not accepted, the plan." While the Bankruptcy Code does not define what constitutes unfair discrimination, it does set certain parameters with regard to when a plan treats secured or unsecured class "fair and equitable." For secured claims, to be fair and equitable, the plan must provide the creditor retains the lien to the allowed amount of the claim and receives "on account of such claim deferred cash payments totaling at least the allowed amount of such claim ... as of the effective date of the plan." 11 U.S.C. § 1129(b)(2)(A). For unsecured claims, the holder of the claim must "receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim." [13] In essence, both secured and unsecured creditors must receive interest on their claims, if the claims are paid over a period of time.

### UNFAIR DISCRIMINATION

■ On its face, the Plan discriminates. Class 1, Travelers' secured claim, allows Travelers to retain its lien on the property until the secured portion of the claim is paid. Travelers will not be paid postpetition/preconfirmation interest on its claim, and it is undisputed that under case law, Travelers is not entitled to receive postpetition interest. In contrast, the Plan's treatment of Class 2, allows Metro North to receive postpetition/preconfirmation interest until the effective date [14] or until capital infusion is achieved. Moreover, even though unsecured,[15] Metro North is treated as a secured creditor and permitted to retain its mortgage lien on the debtor's property. Additionally, and in contrast to Travelers' claim, Metro North's lien appears to continue until its entire claim is satisfied through Plan payments. In effect, Metro North, which is clearly an unsecured creditor, retains a lien and is paid postpetition/preconfirmation interest unlike other unsecured creditors.

■ While the Plan discriminates, to violate § 1129(b)(1), the discrimination must be *unfair. In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr.D.Minn.1990). Moreover, while a debtor may separately classify creditors, that separate classification alone does not determine whether the plan discriminates unfairly. Several courts have outlined a four-part test used to determine

**12.** Metro North argues that only the fair and equitable requirement need be met for cramdown. The basis for this argument lies in the legislative history:

> Specifically, the court may confirm a plan over the objection of a class of secured claims if the members of that class are unimpaired or if they are to receive under the plan property of a value equal to the allowed amount of their secured claims, as determined under proposed 11 U.S.C. § 506(a). The property is to be valued as of the effective date of the plan, thus recognizing the time value of money.

H.R. No. 95–595, 95th Cong., 1st Sess. 413 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6369. This language only pertains to the "fair and equitable" requirement.

> The criterion of unfair discrimination is not derived from the fair and equitable rule or from the best interest of creditors test. Rather it preserves just treatment of a dissenting class from the class's own perspective.

H.R. No. 95–595, 95th Cong., 1st Sess. 417 (1977), U.S.Code Cong. & Admin.News 1978, p. 6373. Clearly, the legislature perceived two separate tests; not one as proposed by Metro North.

**13.** Alternative options exist for the treatment of both secured and unsecured claims. However, these are not applicable to the instant case. *See* 11 U.S.C. § 1129(b)(2).

**14.** There is no statutory authority allowing an unsecured party to receive postpetition interest prior to confirmation. *See* 11 U.S.C. § 506(b). After confirmation, creditors must be paid a "market rate."

**15.** Metro North did file an 1111(b) election with regard to debtor's first Plan of reorganization. *See* Election of Metro North State Bank Under 11 U.S.C. § 1111(b), filed December 30, 1991. Metro North did not renew that election. For purposes of discussion, the Court will treat Metro North as being unsecured. Metro North's interest in the property on account of its claim "is of inconsequential value." 11 U.S.C. § 1111(b)(1)(B)(i).

whether discrimination is unfair,[16] the Court adopts a broader approach as set forth in *In re Aztec Co.*, 107 B.R. 585, 588–91 (Bankr.M.D.Tenn.1989) (providing excellent summary of case law).

■ The debtor offers no reasonable basis for the discriminatory treatment in favor of Metro North. Factually and legally, Metro North is just another unsecured creditor. While separate classification might be justified on legal[17] or factual grounds, in the absence of grounds, separate classification and better treatment is improper discrimination. *See Matter of Greystone III Joint Venture*, 948 F.2d at 139 (recognizing that trade creditors might be separately classified at treated better in order to ensure the debtor can maintain future operations); *In re General Homes Corp.*, 134 B.R. at 863. *Cf. Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d at 1313. Because no plausible rationale for the discrimination exists, confirmation must be denied.

While the discrimination problem justifies rejection of the Plan, the Court will address the balance of the claims raised by Travelers, in the interest of judicial economy.

## FAIR AND EQUITABLE

■ As already noted, in order to be "fair and equitable," the plan must provide that each claimant "receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim ... as of the effective date of the plan." 11 U.S.C. § 1129(b)(2)(A)(ii) and (B)(i). This entitles a secured or unsecured creditor to payments equaling the present value of its claim. *In re E.I. Parks No. 1 Ltd. Partnership*, 122 B.R. 549, 553 (Bankr. W.D.Ark.1990); *In re McCombs Properties VIII, Ltd.*, 91 B.R. 907, 911 (Bankr.C.D.Cal. 1988). Payment of present value entitles creditors to payment of interest or a discount factor on their claims.

■ This Court has previously journeyed down the trail of interest rate determination. *See In re Oxford Square Investors, L.P.*, No. 90–13148 (Bankr.D.Kan., March 4, 1992). As noted therein, *Hardzog v. Federal Land Bank of Wichita (In re Hardzog)*, 901 F.2d 858 (10th Cir.1990) binds this Court to determine a "market" rate of interest. Here, where the parties apparently agree that there is no market rate available, the Court must determine whether, as the debtor suggests, some other rate is appropriate.

In *Hardzog*, the debtors filed bankruptcy after defaulting on a loan secured by a real estate mortgage. At the time of filing, the amount owed was less than the fair market value of the real property. The debtors proposed 7.5% interest. The bank demanded 12.5%. The bankruptcy court concluded that 10% was appropriate based on the bank's cost of funds plus a risk factor.

On appeal, the bank contended that it was entitled to the contract rate of interest. The court of appeals rejected both the contract rate and the mechanical approach of the bankruptcy court, stating:

> Courts are not well situated to craft and determine interest rates. Judges are neither bankers nor lenders and do not have the expertise to set interest rates. A lender, in establishing interest rates to

---

**16.** As outlined in *In re 11,111, Inc.*, the test requires the Court to determine:

1. Whether the discrimination is supported by a reasonable basis;
2. Whether the debtor can confirm and consummate a plan without the discrimination;
3. Whether the discrimination is proposed in good faith; and
4. The treatment of the classes discriminated against.

*Id. See also In re Creekside Landing, Ltd.*, 140 B.R. 713, 715–16 (Bankr.M.D.Tenn.1992); *In re ARN LTD. Limited Partnership*, 140 B.R. at 13.

**17.** Some courts have found a legal distinction in an undersecured creditors right to vote an unsecured claim by reason of § 1111(b). *See In re Bjolmes Realty Trust*, 134 B.R. 1000, 1003 (Bankr.D.Mass.1991); *In re Triple R. Holdings, L.P.*, 134 B.R. 382, 387–89 (Bankr.N.D.Cal.1991). *But cf. Matter of Greystone III Joint Venture*, 948 F.2d at 139. However, Metro North has not made a § 1111(b) election, nor is it entitled to make such an election. Because the debtor has provided no reasonable excuse for the discrimination, and the Court can perceive none, it must be concluded that the Plan unfairly discriminates.

be charged to a borrower, will consider and utilize many facets, including what the competition charges, its cost of funds, the condition of the local economy, its overhead, the character of the borrower, the capacity of the borrower to repay, the value of the collateral, the costs of servicing the loan, the status of the lender's loan portfolio, the lender's ration of loans to assets, its liquidity, and a host of other factors.

. . . . .

Considering that most courts are utilizing a market rate approach and further considering that courts are well equipped to determine market rates, we hold that in the absence of special circumstances, such as the market rate being higher than the contract rate, Bankruptcy Courts should use the current market rate of interest used for similar loans in the region.... It therefore follows that the most appropriate interest rate is the current market rate for similar loans made in the region at the time the new loan is made. This approach should also tend to assure both the lender and the debtor are treated fairly with neither receiving an advantage over the other.

*Id.* at 860.

While the *Hardzog* opinion speaks of making a "loan," as previously noted by this Court, that term is a misnomer in this context. *Oxford Square* at 10. The transaction contemplated in the debtor's Plan "is not a loan in the sense that the secured creditor is advancing funds on the basis of the collateral and terms requested." *Oxford Square* at 11. Rather, the loan is already in place, and the debtor is seeking to have the terms of the loan rewritten in order to insure that it can continue to perform its obligation postconfirmation. It is under this scenario that the Court must determine what interest rate is proper.

*Hardzog* suggests that the debtor is required to "use the current market rate of interest used for similar loans in the region." *Hardzog*, 901 F.2d at 860. The debtor asserts that the term "similar loan" refers to a similar workout loan. Thus, according to the debtor, a lower interest

rate is possible when compared to new loan situations. The Court must agree. The *Hardzog* opinion refers to "similar loans." It does not mandate that the interest rate must be equal to that for a "new loan." In fact, the Tenth Circuit recognized that a myriad of factors must be taken into consideration when determining interest rate. Thus, it would be imprudent to make such a determination in the context of a bankruptcy workout, without taking into account the bankruptcy itself.

The debtor asserts that this "exception" is warranted under its reading of footnote 10 of the *Hardzog* opinion. This footnote appears after the Court opines that the market rate is proper in the absence of special circumstances and provides: "We deliberately reserve until the issue is properly before us, a definition of the parameters of 'such special circumstances.'" *Hardzog*, 901 F.2d at 860 n. 10. However, such an exception is not necessary under the present facts. Were the debtor offering an interest rate at less than the current workout rate, then resort to the "special circumstances" language might be necessary.

Travelers' reliance on this Court's opinion in *Oxford Square* is inapposite. In *Oxford Square*, neither party argued that the appropriate rate of interest was that of similar "workout" arrangements. Rather, the evidence in that case related only to the proper interest rate on a new loan. Because the evidence did not support the rate offered by the debtor, the Court denied confirmation.

As should be well-recognized by all courts, a debtor would probably not be in bankruptcy but for its inability to refinance its existing debts. Requiring a debtor to prove that the loan would be made without taking into account the bankruptcy places the debtor in a Catch–22 situation; no ability to obtain financing prior to bankruptcy due to financial problems, and no ability to obtain financing in bankruptcy because the standard to be met is that of prebankruptcy loans. If there is indeed a new loan "market" rate for loans to debtors in bank-

ruptcy, no evidence of it has ever been presented to this Court.[18]

It is, therefore, concluded that the "market rate" refers to the market rate of interest in similar workout situations. The parties should presume that the loan is to be made. Factors such as competition charges, cost of funds, and conditions of local economy only serve to determine what interest rate is proper.

Evidence presented at trial reflects that 8.5% is an appropriate rate of interest on workout loans. Steve Martens testified that the interest rate for workout loans in this area ranged from 8.5% to 9.5%. While this testimony was disputed by Travelers' expert witnesses, the Court discredits those witnesses as basing their opinion on whether a new loan would be made under the conditions set forth in the Plan. As already noted, the parties must presume that the loan will be made, and then seek to determine the proper interest rate.

### IMPROPER MODIFICATION OF LOAN DOCUMENTS

As a final meritorious objection,[19] Travelers asserts that the plan's modification of its loan and security documents is improper. A simple review of the statutory language is all that is necessary to reject Travelers' argument. There is no support for the proposition that a debtor cannot modify loan documentation. Indeed, were Travelers' assertion viable, it would make unworkable the whole reorganization process.

The foregoing constitutes findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) and Fed.R.Bankr.P. 7052. A separate judgment will be entered giving effect to the determinations reached herein.

18. In over six years on this bench, the undersigned has yet to hear any testimony which supports a finding that there is a new loan market rate for entities and individuals in bankruptcy proceedings.

19. Travelers has two minor objections which it has tagged on at the end of its motion. The first appears to be merely a statement and, therefore, merits no discussion. The latter requests the

### JUDGMENT ON DECISION DENYING DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION

The instant proceeding comes before the Court for ruling on confirmation of Stratford Associates Limited Partnership's ("debtor") Second Amended Plan of Reorganization ("Plan") and Travelers Insurance Company's ("Travelers") objection thereto. The Honorable John K. Pearson, United States Bankruptcy Judge, presiding. The matter having been submitted through stipulations and briefs to the Court, and a decision having been rendered,

IT IS ORDERED BY THE COURT that the confirmation of the Plan be, and the same hereby is denied.

IT IS FURTHER ORDERED that the debtor will be given twenty days to propose an amended plan.

Plan be modified so as to preserve any rights or causes of action held by the debtor. Although advisable in case the debtor intends to pursue preference actions, there is no requirement in the Code that such language be included in the plan. Without a specific reference as to how the absence of such a provision violates the provision of § 1129, the Court will not order such a modification.