**In re Fernando M. EGEA, Debtor.**

**Bankruptcy No. 92–41961–11.**

United States Bankruptcy Court,
D. Kansas.

May 27, 1994.

William E. Metcalf of Metcalf & Justus, Topeka, KS, for debtor.

Richard L. Reid of Shapiro & Reid, Kansas City, KS, for Bank.

### MEMORANDUM OPINION AND ORDER

JULIE A. ROBINSON, Bankruptcy Judge.

This matter comes before the Court pursuant to the Motion For Relief From the Automatic Stay filed by State Street Bank and Trust Company ("Bank") on February 11, 1994. Hearings were held on March 14, 1994, and April 7, 1994, at which time the Court took the matter under advisement. Fernando M. Egea ("Debtor") appeared in person and by and through his attorney, William Metcalf. The Bank appeared by and through its attorney, Richard Reid.

### JURISDICTION

The Court has jurisdiction over this proceeding. 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(b)(2)(G).

### FINDINGS OF FACT

Debtor, Fernando M. Egea, filed a Chapter 11 bankruptcy petition on October 27, 1992. Debtor has not proposed a Chapter 11 plan because he is awaiting the outcome of a § 523 adversary proceeding regarding the dischargeability of a significant tax liability. On February 1, 1993, Bank filed a motion for relief from stay, which was denied by Judge John T. Flannagan. Bank appealed the decision, but later dismissed its appeal. Bank then filed a second motion for relief from stay.

Debtor and his wife, Marcelina Egea, executed a note and mortgage to the Bank on their homestead, which is the first mortgage and senior lien on the property.[1] Debtor does not currently reside in the house. Debtor's estranged wife and daughter live there.

Pursuant to the terms of the note, Debtor is required to make installment payments of $2,912.80 per month to Bank. Debtor has not made a payment since June of 1992 and has not paid real estate taxes or insurance on the property causing Bank to expend $14,648.42 after the escrow account was exhausted. Debtor owes Bank $237,112.80 in principal plus interest and advances for taxes and insurance. The contract rate of interest is 13.75%, with interest accruing at the rate of $88.70 per diem or about $2700 per month.

---

**1.** Lot 27 and the East Half of Lot 26 as measured along the rear lot line of said Lot 26, SPANISH GARDEN ESTATES, a subdivision in the City of Overland Park, Johnson County, Kansas.

NOW KNOWN AS:
Lot 10, Block A, Nottingham Forest, Eighth Plat, a subdivision in the City of Overland Park, Johnson County, Kansas.

In addition, the note provides for a 4% late charge, which is $116.51 per late payment.[2] The principal balance, plus accrued interest at the contract rate, plus legal fees, late charges, and site inspection fee total $313,010.01 as of April 7, 1994.

The parties disagree about the value of the house. The sole appraisal witness was Richard Lee Livingston, who had done a "drive-by" appraisal on March 20, 1993, and a full access appraisal on April 1, 1994. In 1993, Livingston appraised the house at $450,000. In 1994, he appraised it at $350,000. Debtor wants the Court to rely on the 1993 appraisal; the creditor likes the 1994 appraisal.

Livingston's 1993 appraisal was hindered by the fact that he had no access to the interior and limited access to the exterior of the house, which he subsequently discovered was in need of approximately $42,000 in repairs.[3]

Thus, the 1993 appraisal assumed that the house was in good condition; but the 1994 appraisal characterized the house as in "average condition". Based on this perceived change in the condition of the house, in 1994 Livingston chose "average condition" comparables in the $300,000–$377,300 range, rather than "good condition" comparables in the $395,000–$497,000 range, as he had in 1993. Livingston testified that there are a number of factors, other than the cost of repairs, that explain the $100,000 difference in the two appraisals, including the fact that the house had not sold since it was listed in July 1993. Debtor testified that he originally listed the house for $475,000, reduced the price to $400,000 in January 1994, and had not received any written offers to purchase the property, although he had received two oral offers for $400,000.

Despite the $100,000 difference in appraisals, there is no evidence to suggest that the property has actually depreciated since Debtor filed bankruptcy. Livingston testified that he did not know whether the property was in need of repair in 1993. Left unrepaired, the property value may depreciate, but Debtor testified that he would do some repairs.

The Bank is oversecured. In addition to Bank's lien, there are a number of junior liens, including federal tax liens, state tax warrants, judgment liens, and mortgages granted to the Employees Pension Trust of Fernando Egea M.D., Chartered, Debtor's medical practice, for loans Debtor took from the pension and profit sharing accounts of five employees. Debtor testified that the house is necessary to an effective reorganization, because if Debtor sells the property, he will secure a price high enough to pay his employees something, while a foreclosure sale will squeeze out these junior lienholders. As of December 31, 1990, these employees were owed $175,625. The federal tax liens, state tax warrants, and judgment liens total more than $150,000.

## CONCLUSIONS OF LAW

Bank seeks relief from stay on the basis that Debtor has no equity in the property and that although Bank is oversecured, Bank stands to lose its oversecured position as interest, insurance and taxes continue to accrue. Debtor counters that although there is no equity in the property, Bank's interests are protected by an equity cushion. Debtor further contends that the property is necessary to an effective reorganization because the employees of his medical practice will realize nothing if Bank forecloses and bids its judgment; while a sale at fair market value will result in some distribution to these employees, whose partial satisfaction and con-

2. Bank and Debtor agree that Debtor owes $14,648.42 for escrow disbursements for insurance and taxes; and further agree that Bank is oversecured and thus entitled to post-petition interest. However, Debtor disputes the amount of accrued interest claimed by Bank because Debtor thinks postpetition interest should accrue at the market rate, not the contract rate. In addition, Debtor objects to the late charge as an unreasonable penalty.

3. Necessary repairs include: replacing the tile roof ($20,000); fixing water damage ($2,500–$3,000); replacing worn and dated carpet ($15,000); exterior painting ($1,500); repairs to stucco ($400–$500), painting stucco ($30); replacing cracked mosaic tiles ($500); and interior paint ($2700).

tinued employment is critical to his reorganization.

Section 362(d) of the Bankruptcy Code provides alternative grounds for the granting of relief from stay. Relief shall be granted for cause, including the lack of adequate protection of an interest in property. *See* 11 U.S.C. § 362(d)(1). Alternatively, with respect to property of the estate, relief shall be granted if Debtor does not have equity in the property and the property is not necessary to an effective reorganization. *See* 11 U.S.C. § 362(d)(2).

The parties agree that the aggregate of the liens on the property exceeds the value of the property, such that there is no equity available to Debtor. Although Bank enjoys an equity cushion, with respect to § 362(d)(2)(A) the Court must determine equity by deducting the value of the property from the total amount of liens against the property, not just the lien of the moving party. The Court is aware that some courts define equity in the manner that Debtor urges. *See, e.g., In re Cote*, 27 B.R. 510, 513 (Bankr.D.Or.1983) (equity is determined by subtracting from the value of the property the amounts owing to the plaintiff and upon liens superior to plaintiff's without considering amounts owing upon liens inferior to plaintiff's lien); *Matter of Certified Mortgage Corp.*, 25 B.R. 662 (Bankr.M.D.Fla.1982). But, the Court agrees with the majority of courts who abide by the plain language of § 362(d)(2)(A) and consider the amount of all of the liens. *See, e.g., Stewart v. Gurley*, 745 F.2d 1194 (9th Cir.1984); *La Jolla Mortgage Fund v. Rancho El Cajon Assocs.*, 18 B.R. 283, 290 (Bankr.S.D.Cal.1982) (all secured claims are totalled to determine equity under § 362(d)(2)(A), whether or not all secured claim holders have requested relief from stay).

However, the fact that there is no equity available to Debtor does not end the Court's inquiry. The Court must also determine whether the property is necessary to an effective reorganization.

Debtor contends that the house is necessary to an effective reorganization, because by selling it himself, he can secure a price that will result in some distribution to the employees of his medical practice, whose liens are junior to Bank's lien. If Bank forecloses on the property, it will undoubtedly bid in the amount of its judgment, thus squeezing out the junior lienholders. In determining whether Debtor's house is necessary to an effective reorganization, the Court must first examine what purpose it will serve in a reorganization. If Debtor resides in the house, the Court should determine whether there is suitable, affordable, alternative housing. *See In re Leonard*, 151 B.R. 639 (Bankr.N.D.N.Y.1992). If Debtor needs the house to produce income, the Court should examine the nexus between the house and the production of income, and determine whether the house is a necessary or merely convenient situs for the production of income. *See In re Wilks*, 123 B.R. 555 (Bankr. W.D.Tex.1991).

In this case, Debtor is not living or conducting any business at the house. Rather, his sole or main objective is to sell the home himself, instead of having the home sold in a foreclosure sale. He testified that in this way, he hopes to provide for a partial distribution to his employees whose continued services he needs in order to reorganize.[4]

The debtor in *La Jolla Mortgage Fund v. Rancho El Cajon Assocs.*, 18 B.R. 283, 291 (Bankr.S.D.Cal.1982), made a similar argument that property is necessary to an effective reorganization to the extent that the debtor can liquidate the property and pay junior lienholders. This Court adopts the reasoning of the court in *La Jolla*, which accepted the debtor's theory, but found that even under the "most optimum circumstances" the property could not produce any significant reduction in the claims of the junior lienholders, and thus could not be necessary to an effective reorganization. *Id.*

There is merit to Debtor's argument that he needs his employees to effectively reorganize and that unless he can use the proceeds

---

**4.** The Debtor's medical practice, Fernando Egea M.D., Chartered, is in a separate Chapter 11 bankruptcy.

of the sale of his house to pay down the loan he has against their retirement and profit sharing account, they may leave. However, unless Debtor can demonstrate a strong likelihood that he will sell the property at a price that will result in a significant payment to the employees, the Court cannot find that the property is necessary to an effective reorganization. It is unlikely Debtor could salvage the morale and services of his employees without a significant reimbursement of their retirement funds.

The parties do not agree on the value of the property, nor on the amount of Bank's lien. In order to determine what type of distribution the employees might expect, the Court turns to the issues of value and the amount of Bank's lien; issues raised in Bank's Motion for Relief from Stay, and in Debtor's Motion to Determine the Secured Status of Bank. Debtor's Motion to Determine Secured Status was filed on June 28, 1993, and taken under advisement by Judge John T. Flannagan. After hearing evidence on these matters during the hearing on the Motion for Relief from Stay, the parties agreed that this Court could decide the Motion to Determine Secured Status as well.

The parties contest the value of the house. Bank relies on the $350,000 appraisal done in 1994; Debtor relies on the $450,000 appraisal done in 1993. Debtor acknowledges that the value should be reduced by the cost of repairs, approximately $42,000, for an adjusted value of about $408,000.

The Court finds that the "full access" appraisal done in 1994 is more reliable than the "driveby" 1993 appraisal. However, the 1994 appraisal is flawed. In 1993, Livingston chose "comparables" in the $395,000–$497,000 range. In 1994, he chose down-graded "comparables" in the $300,000–$377,300 range. He explained that the 1993 comparables were homes in good condition while the 1994 comparable were homes in average condition like the subject property. Yet, in the

1994 appraisal, he found it necessary to make further adjustments based on condition of the property. This practice, of choosing comparables based on condition, then making further adjustments for condition, is duplicative and particularly suspect, given the $100,000 difference in the price range of the 1993 comparables and the 1994 comparables.

Therefore, the Court adopts neither appraisal. The Court finds that the value of Debtor's residence is $375,000. This finding is based on an analysis of the two appraisals, as well as a consideration of Debtor's efforts to sell the home. Debtor listed the property for $475,000 in the summer of 1993. In January 1994, he reduced the price to $400,000. Debtor testified that he recently received two "oral offers" to buy the property for $400,000, but he has never received an offer in writing.

The Court must also determine the amount of Bank's lien. Debtor stipulates that the principal balance due is $237,112.80. While Debtor concedes that Bank is oversecured and entitled to postpetition fees and interest pursuant to § 506(b), Debtor argues that upon the filing of the bankruptcy petition, Bank is entitled to the market rate of interest, not the contract rate.

The Court rejects Debtor's argument. Prior to confirmation, an oversecured creditor is entitled to interest at the contract rate, unless the Court finds that the contract rate is usurious or otherwise unreasonable. An oversecured creditor's right to interest is not dependent on a contract or note. See *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Nevertheless, when the oversecured creditor has a bargained for rate of interest, prior to confirmation, interest accrues at the contract rate.[5]

In this case, the contractual rate of interest is 13.75%. There is no separate default rate. Debtor did not present any evidence nor make any argument that the

---

5. Debtor cites Judge Flannagan's unpublished opinion *In re Osterhaus,* Case No. 90–40664 (Bankr.D.Kan.1991), but misreads the decision. In *Osterhaus,* Judge Flannagan determined that the appropriate interest rate in the context of confirmation of a Chapter 12 plan was the mar-

ket rate of interest. In that case, the debtor had conceded that the oversecured creditor was probably entitled to its contract rate for the period between the filing of the petition and the confirmation of the plan.

contractual rate is unreasonable or inequitable. Therefore, the Court finds that prior to confirmation, interest accrues at the contractual rate of 13.75%, resulting in $59,832.78 in accrued interest from June 20, 1992 to April 7, 1994.

■ The Bank also asks that fees, costs, and charges be allowed as part of its secured claim pursuant to the note: $14,648.42 in escrow deficit; $1,284.50 in legal fees; $116.51 in late charges (4% of any missed or late monthly payment); and a $15.00 site inspection fee. Debtor objected, in particular, to the 4% late charge. However, the plain language of § 506(b) provides for the inclusion of late charges provided for in the note. As long as the charge represents reasonable compensation for costs associated with the debtor's delinquency, and is not a punitive measure, late charges are permissible. *Mack Financial Corporation v. Ireson,* 789 F.2d 1083 (4th Cir.1986); *In re Consolidated Properties Ltd. Partnership,* 152 B.R. 452, 455, 458 (Bankr.D.Md.1993). The Court finds these fees, costs and charges, reasonable and allowable under § 506(b).

■ Thus, as of April 7, 1994, Bank is owed a total of $313,010.01, or about $62,000 less than the value of the residence, $375,000. Therefore, if Debtor sells the property immediately, the employees will receive about $60,000 on about $175,000 in claims, or about ⅓ of the funds they rely on for retirement. The Court finds that the property is necessary to an effective reorganization, because although the employees will not be fully reimbursed, if they can recover one-third of the funds expended, that may make a significant difference in the viability of Debtor's medical practice and his reorganization.

■ The Court's final inquiry is whether the equity cushion in this property is sufficient to adequately protect the interest of Bank. As discussed above, as of April 7, 1994, there is about $62,000 in equity available to Bank, a cushion of about 16.5%.

While in some circumstances, such a cushion may alone be sufficient to adequately protect the interests of the secured creditor, in this case it is not. Debtor has had the property on the market for a year without any serious offers. Four months after he reduced the price by $75,000, there were still no written offers. The Court must assume that even if Debtor reduced the price to $375,000 tomorrow, he might not sell the property immediately. Debtor and the appraiser testified that upper bracket homes do not sell very quickly; and it was the appraiser's opinion that even at $350,000, it would take a while to sell the home. Meanwhile, about $2,700 in interest accrues each month, and Debtor has not represented that he can or will make any payments. Furthermore, without immediate repair, the holes in the roof and stucco and the water damage may worsen and make the home become less attractive to potential buyers. Thus, the Court concludes that any cushion available to Bank now will only diminish, and perhaps disappear. Therefore, the motion for relief from stay is granted, but execution is stayed until October 31, 1994. If Debtor sells the property and remits the appropriate balance to Bank before October 31, 1994, the Order Granting Relief from Stay shall be rendered moot. If Debtor fails to remit the entire balance due Bank before October 31, 1994, Bank may execute on the Order and Judgment on October 31, 1994 without seeking further order from this Court.

**IT IS THEREFORE ORDERED BY THE COURT** that Bank shall be allowed its contract rate of interest for the post-petition, pre-confirmation period; and Bank's fees, costs and charges as set forth above are reasonable and allowable under 11 U.S.C. § 506(b).

**IT IS FURTHER ORDERED BY THE COURT** that Bank's Motion for Relief From Stay shall be GRANTED, but execution on this Order and Judgment is stayed until October 31, 1994.

This Memorandum shall constitute findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by Rule 9021 of the Federal Rules of Bankruptcy Procedure and

Rule 58 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.