### In re VALLEY VIEW SHOPPING CENTER, L.P., Debtor.

#### No. 98–23756–11.

United States Bankruptcy Court, D. Kansas.

Feb. 2, 2001.

Cynthia F. Grimes, Grimes & Rebein, L.C., Lenexa, KS, Chris W. Henry, Payne & Jones, Chartered, Overland Park, KS, for debtor.

## MEMORANDUM OPINION AND ORDER

JULIE A. ROBINSON, Bankruptcy Judge.

Before the Court for consideration are two competing plans of reorganization, that of the Debtor and ANICO. The Court conducted a confirmation hearing on August 29 through 31, 2000. For the reasons expressed herein, the Court concludes that the Plan proposed by the Debtor is confirmable; the Plan proposed by ANICO is not confirmable; and the Plan of Debtor will be confirmed.

### JURISDICTION

The Court has jurisdiction over this proceeding. 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(b)(2)(L).

### FINDINGS OF FACT

Valley View Shopping Center, L.P. ("Debtor") is a Kansas limited partnership formed in 1971. Debtor filed this voluntary chapter 11 on December 24, 1998, and has been in possession of its assets and operations since the filing date.

Debtor's general partner is Varnum/Armstrong/Deeter, LLC ("VAD") as successor to the original corporate general partner, Century Enterprises, Inc. It has 15 limited partners, most of whom are retired school teachers who invested in Debtor at its inception.

Debtor has two primary assets, the largest of which is its operation of a shopping center in Overland Park, Kansas, pursuant to a long-term ground lease entered into on October 31, 1972 as modified on December 19, 1987 ("Lease"). Debtor subleases space in the premises to various subtenants at the shopping center pursuant to written subleases ("Tenant Leases"). Debtor's other asset is a 50% limited partnership interest in a partnership

called College Village Associates, LP. Debtor is managed by VAD[1] pursuant to a written management lease, which provides for 6% of monthly rental collections as a management fee in consideration for the management services it provides. VAD has managed the shopping center from the inception of the Debtor.

**Background Related to Rent Dispute and ANICO.**

American National Insurance Company ("ANICO") is a Texas based insurance company that owns the real estate and shopping center leased by the Debtor. ANICO is both a landlord with respect to the Debtor and the holder of a mortgage secured by the improvements on the Lease. Debtor's predecessor in interest originally owned the land on which the shopping center is built, but transferred it to ANICO in a "sale-leaseback" type of financing arrangement for $1,000,000 in 1972. At that time, Debtor's predecessor entered into the Lease as well as a Note and Mortgage in the principal amount of $1,500,000. The Lease was modified in 1987 ("Lease Modification Agreement"), and the parties entered into a new Note and Mortgage in the principal amount of $3,100,000. The Leasehold Mortgage provides for monthly amortized payments of principal and interest at 10¼% interest, for total monthly payments of $28,718 per month through a term of 2013. Debtor has never defaulted on the Mortgage and pursuant to an Agreed Cash Collateral Order, has paid the monthly mortgage payments to ANICO as adequate protection since the filing date.

The Lease requires Debtor to pay Fixed Rent in the amount of $119,500 per year, through October 31, 2002. Effective November 1, 2002, the annual Fixed Rent increases to $127,000, and again November 1, 2012, to $135,000. In addition to Fixed Rent, the Lease requires the Debtor to pay ANICO 25% of the amount by which the Debtor's annual gross revenue derived from its sublease of the Leased Premises to third parties exceeds $430,000 ("Percentage Rent"). On or before March 1 of each lease year, the Lease requires the Debtor to provide to ANICO a verified written statement which sets forth the accounting detail from which the Debtor has calculated the Percentage Rent due for the prior year, along with the Percentage Rent due. The Lease provides that ANICO is entitled to interest at the rate of 10% per annum, accrued from the due date on any unpaid rent until paid in full.

The Debtor performed under the Lease until 1992, when it encountered cash flow difficulties, due in part to escalating real estate taxes and operating expenses. As a result, the Debtor did not timely pay Percentage Rent for 1992 through 1995, although it remained current on the Fixed Rent and the Mortgage. On December 3, 1998, ANICO's counsel sent a Notice of Demand to the Debtor demanding payment of past due Fixed Rent and any amounts due under Percentage Rent for the years 1993–1997. ANICO also sent a Notice of Termination of the Lease and filed a forcible detainer action in Johnson County District Court. These actions were stayed by the filing of Debtor's chapter 11 on December 24, 1998.

In the context of ANICO's motion for relief or clarification from stay, the Court on April 15, 1999, ultimately ruled that the Lease was not terminated prior to the bankruptcy filing. The decision did not, however, address the amount of any monetary default under the Lease since the

---

1. The principals of VAD are Ralph W. Varnum, President; the Estate of Reginald Armstrong; Kirby Deeter; and Ron Smith, who died in October 2000.

issue was not before the Court at that time.

After receiving orders extending the time to assume or reject unexpired leases and executory contracts, the Debtor on May 12, 1999, timely filed a Notice to assume the Lease and either cure or give adequate assurance of cure of any amounts found by the Court to be due under the Lease.

ANICO filed a proof of claim asserting monetary default due under the Lease as of the date of filing in the amount of $410,509.26, which included amounts for interest and attorneys fees. The Debtor objected. On April 6, 2000, the parties entered into a Stipulated Order partially resolving the Debtor's objection to ANICO's claim. Specifically, the parties agreed that the cure amount through the date of filing is $375,000, but preserved for future determination the amount of Percentage Rent, if any, due for 1998 and 1999, the amount of attorneys fees and interest.

At trial, the Court ruled that ANICO was not entitled to attorney's fees [2], either pursuant to language in the Lease or under 11 U.S.C. § 506(b) [3] as an oversecured creditor. The Court further ruled in ANICO's favor regarding the calculation of percentage rents. In light of this ruling, the Debtor conceded that it had not paid the 1998 and 1999 Percentage Rent in accordance with the Lease, and that it owed additional Percentage Rent of $63,132.23 for 1998 and $24,615.13 for 1999, for a total principal of $462,747.36, plus interest at the contract rate of 10% on these amounts of $9,513.08 and $1,240.87, for a total Allowed Cure Amount of $473,501.31.

ANICO maintains that the Allowed Cure Amount is calculated by adding to the amount stipulated by Debtor at trial, post-petition interest in the amount of $63,390.41 accrued on the stipulated amount of $375,000 from the petition date through the date of the confirmation hearing plus interest accrued at the contract rate of 10% on all unpaid rent through the date of payment.

**Debtor's Plan**

Debtor filed its initial Plan and Disclosure Statement on June 15, 1999, within an extended period of exclusivity, and filed its First Amended Plan and Disclosure Statement on February 17, 2000 ("Debtor's Plan"). Debtor modified the Plan on August 18, 2000. Debtor's Plan includes administrative and priority claims and five classes of creditors and parties in interest. With respect to administrative and priority claims, the Debtor's Plan provides that administrative claims shall be paid in full in cash on the Effective Date; and, that priority claims will be paid in accordance with § 1129(a)(9). The only anticipated administrative claims are the Debtor's counsel's fees and the U.S. Trustee fees. Counsel has agreed to accept deferred cash payments out of non cash collateral of ANICO to the extent her fees exceed the retainer, and the U.S. Trustee fees have been paid current and will be paid through the entry of the final decree from available cash flow. There are no anticipated priority claims.

Class 1 is the Secured Claim of ANICO. The Plan provides two options available at ANICO's election: Option A, a buyout of ANICO's leasehold and fee interest, or Option B, a restructuring of the mortgage and cure of the lease. ANICO did not

---

**2.** ANICO claimed it was entitled to attorney's fees in the amount of $68,817.01.

**3.** Future references are to Title 11 of the United States Code unless otherwise specified.

select an option in its ballot; thus, the restructuring option applies pursuant to the treatment provided in Class 2. Under Class One, Option B, ANICO will retain its liens, and will receive monthly payments at 8.5% interest or such other interest as the Court determines to constitute present value over a term and amortization extended from the original expiration date of 2013 to October 31, 2022 (coterminous with the expiration of the Lease).

Class 2 is the treatment of ANICO's cure amount. The parties have stipulated that as of the filing date, ANICO has a claim for prepetition rent arrearages of $375,000. At trial, Debtor conceded that the Allowed Cure Amount also includes 1998 and 1999 unpaid percentage rent, plus interest accruing at 10% per annum on such unpaid amounts, for a total cure amount of $473,501.31. The Plan as modified proposes to pay ANICO up to $475,000 on the effective date of Debtor's Plan. Although Debtor does not propose to pay ANICO post-petition interest on the $375,000, it proposes that to the extent the Allowed Cure Amount exceeds $475,000, Debtor will pay $375,000 on the effective date and the balance over one year at 8.5% interest. At trial, the plan was orally modified to cure the balance over two years in the event the cure amount exceeded $475,000. After the trial, Debtor filed an affidavit of Karen Miller stating that VAD was prepared to advance the entire $475,000 cure amount on the Effective Date, without obtaining a loan.

Class 3 is the Allowed Unsecured Claims of Non–Insiders. There is approximately $15,000 in Allowed Unsecured Claims. Class 3 provides for payment in full without interest 90 days after the Effective Date.

Class 4 is the Allowed Unsecured Claims of Insiders. This Class consists of the accrued unpaid lease commissions, re-imbursements, and management fees, both pre and post petition, of VAD. Class 4 will be paid 100 percent 90 days after the Effective Date without interest, or as cash flow allows. Pursuant to the Cash Collateral Order, VAD has accrued but not paid management fees, commissions and certain reimbursements post petition.

Class 5 consists of VAD, the general partner equity interest of the Debtor, which will retain its interests. VAD orally agreed at trial to advance at least $100,000 to Debtor to fund payment of the Allowed Cure Amount, and to defer payment of its management fees, commissions and reimbursements if cash flow required.

Class 6 consists of the limited partners of Debtor, who will retain their interests, but who will not be entitled to distributions of cash flow from the Debtor pursuant to the projections for the first two to three years of the Plan.

**Debtor's Liquidation Analysis.**

Debtor did not file a detailed liquidation analysis, instead hypothesizing that its only asset, the Lease, would be rejected upon conversion to chapter 7, resulting in a significant unsecured claim against the estate for rent arrearages and no distribution to unsecured creditors. Debtor did submit at trial a liquidation analysis of the partnership which showed an estimated tax liability for each partner of $57,000.

**Sources of Funding the Plan.**

Debtor will fund the Plan from its operating income derived from the tenant leases. In addition, VAD has obtained funds to advance to Debtor to pay ANICO the allowed cure amount up to $475,000 on the Effective Date of the Plan. (Affidavit of Karen Miller filed 10/17/00).

**Balloting, Voting and Acceptance/Rejection of Classes.**

The Court approved Debtor's Disclosure Statement by Order dated July 14, 2000,

and creditors and parties in interest were given until August 15, 2000 to submit ballots and file objections to confirmation of either or both Plans.

ANICO voted to reject Debtor's Plan in Class 1 and Class 2.

With respect to Class 3, thirteen unsecured creditors voted. Six creditors holding claims of $17,932.51 voted in support of Debtor's Plan. ANICO voted to reject Debtor's Plan as the assignee of seven creditors holding claims of $2,377.95. Creditors holding more than two-thirds of the total amount of unsecured claims of $20,310.46 voted for Debtor's Plan, but only six of thirteen unsecured creditors voted to accept Debtor's Plan. Debtor filed a motion to strike the votes of assigned claims of KPL ($126.68), Instant Delivery ($37.80) and Reddi Services ($255.37) on the grounds these creditors were either paid or are administrative postpetition creditors not entitled to vote. For reasons more particularly set forth during trial, the Court granted Debtor's motion to strike the three paid claims, adjusting the total accepting votes to six of ten unsecured creditors. Without discussion of whether Debtor has artificially impaired Class 3, Debtor's Class 3 has accepted the Plan both in terms of number and amount of claims.

Classes 4, 5 and 6 voted 100% to accept Debtor's Plan.

Of tenants and parties in interest, Debtor received six ballots, all accepting Debtor's Plan. One ballot, Pride Cleaners, accepted both Plans, but indicated a preference for Debtor's Plan.

**ANICO's Plan.**

ANICO filed its initial Plan on March 7, 2000, incorporating the Disclosure Statement filed by Debtor. ANICO filed its First Amended Plan on June 7, 2000, which was modified on August 29, 2000.

Although titled Plan of Reorganization, ANICO's Plan is essentially one of liquidation, contemplating the sale, transfer and assignment to the highest and best bidder of the Debtor's right, title and interest under the Lease, subject to the Leasehold Mortgage, and the Tenant Leases. ANICO's Plan provides that administrative claims shall be paid in full in cash as soon as practicable after the Effective Date. The only anticipated administrative claims are the Debtor's counsel fees.

Class 1 is the allowed unsecured claims entitled to priority under § 507, which shall be paid in cash on the Effective Date.

Class 2 is the allowed secured claim of ANICO under the Loan Documents. On the Effective Date, the Lease assignee shall cure all monetary defaults under the Loan Documents by the payment of cash to ANICO and compensate ANICO for any actual pecuniary loss resulting from Debtor's defaults under the Loan Documents. In addition, the Lease assignee shall, by assumption, replace the Debtor as the obligor under the Loan Documents. ANICO shall retain its liens securing its Class 2 claim.

Class 3 is the allowed secured claim of ANICO under the Lease. This claim shall be secured to the full extent of the Debtor's indebtedness under the Lease, including but not limited to the $375,000 amount previously stipulated to by the parties. The Reorganized Debtor shall cure all defaults, compensate ANICO for any pecuniary loss, and provide adequate assurance of the Lease Assignee's ability to perform under the Ground Lease.

Class 4 is the allowed unsecured claims, which will be paid in full on the Effective Date.

Class 5 is the allowed interests, which will receive, on a pro rata basis, from the

Reorganized Debtor on the Effective Date, cash remaining after the. Reorganized Debtor pays all allowed claims and funds the disputed claims reserve.

**ANICO's Liquidation Analysis.**

ANICO did not file a liquidation analysis, instead incorporating the Disclosure Statement filed by the Debtor.

**Sources of Funding ANICO's Plan.**

ANICO will fund its Plan with Debtor In Possession funds, operating revenues and proceeds from the transfer and assignment of the Lease and the Tenant Leases. Other estate property, including proceeds, recoveries or settlements derived or resulting from the estate's causes of action shall also fund the Plan.

**Balloting, Voting and Acceptance/Rejection of Classes.**

ANICO's own classes 2 and 3 voted to accept its Plan. Classes 4 and 5 voted to reject, as did tenants and parties in interest.

## CONCLUSIONS OF LAW

■■■ The Court's starting point is to determine whether either or both of the plans as presented are confirmable. In order for the Court to confirm either Plan, the Court must find that each of the required elements of § 1129(a) have been met.[4] If all of the subparts of § 1129(a) except (a)(8) have been met, a plan may still be confirmed under the so-called cramdown provisions of § 1129(b). The requirement of § 1129(a)(8), unanimous acceptance of the plan by impaired classes, does not have to be met if the plan does not discriminate unfairly and is "fair and equitable" with respect to each impaired

class of claims that has not accepted the plan.[5] The proponent of the plan bears the burden of proof with respect to each element of §§ 1129(a) and 1129(b) under a preponderance of the evidence standard.[6]

The Court will address each of the requirements of § 1129(a) and (b) with respect to each Plan.

## I. THE DEBTOR'S PLAN.

### A. Requirements for Confirmation That Were Not Challenged by AN-ICO.

As a threshold matter, the Court will address the confirmation requirements that went unchallenged by ANICO.

**Section 1129(a)(4).**

Section 1129(a)(4) requires that "[a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."[7] The primary administrative expenses are the professional fees and expenses of Debtor's bankruptcy counsel, Grimes & Rebein, L.C., and the U.S. Trustee fees. The Debtor has acknowledged that the Bankruptcy Code requires that the attorney fees and expenses are subject to approval by the Court as reasonable. Grimes & Rebein have filed interim fee applications for approval of compensation and have agreed to accept deferred cash payments out of non cash collateral of ANICO to the extent the fees exceed the

---

4. 11 U.S.C. § 1129.

5. *See* 11 U.S.C. § 1129(b)(1).

6. *In re Stratford Associates Ltd. Partnership,* 145 B.R. 689, 693 (Bankr.D.Kan.1992); *In re*

*Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1165 (5th Cir.1993), *cert. denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993).

7. 11 U.S.C. 1129(a)(4).

retainer. The Plan further establishes a deadline ("bar date") for filing administrative claims.

### Section 1129(a)(5).

Section 1129(a)(5) requires that the Debtor disclose any director, officer, voting trustee, participating affiliate or successor to the debtor under the plan. The Debtor's Plan discloses that it is a Kansas limited partnership and its General Partner is Varnum/Armstrong/Deeter, L.C. (VAD), as successor to the original corporate general partner, Century Enterprises, Inc. VAD manages the shopping center pursuant to a written contract. None of the members of VAD are currently general or limited partners of the Debtor. VAD is an Insider as defined by the Bankruptcy Code.

### Section 1129(a)(6).

Section 1129(a)(6) is not applicable to the Debtor. That section requires debtors subject to governmental regulation of their prices or rates, to obtain governmental approval of any rate changes in the Plan.

### Section 1129(a)(9).

Section 1129(a)(9) requires certain treatment of priority claims.[8] There are no holders of claims against the Debtor under §§ 507(a)(2), (a)(3), (a)(4), (a)(5), (a)(6), or (a)(7). The only claims entitled to priority and subject to § 1129(a)(9) are the § 507(a)(1) administrative expense claims against the Debtor: the professional fees and expenses of Debtor's bankruptcy counsel, Grimes & Rebein, L.C., and possibly, expert witnesses used at the confirmation hearing.

Section 1129(a)(9)(A) requires that allowed administrative claims be paid in full in cash on the effective date of the plan. Debtor's Plan provides that "[h]olders of Allowed Administrative Claims that are Allowed as of the Confirmation Date shall receive payment in full in Cash on the Effective Date, unless the holder of such claim agrees to different treatment." Grimes & Rebein have agreed to less favorable treatment, deferred cash payments out of non cash collateral of ANICO to the extent the fees exceed the retainer. The Plan further provides that "[a]ny post-confirmation Allowed Administrative Claims as may be timely submitted pursuant to the Bar Date shall be paid in cash within 30 days after the Order allowing such Claims becomes final, unless the holder of such claim agrees to different treatment." The Debtor anticipates no such post-confirmation Administrative Claims.

### Section 1129(a)(12).

Section 1129(a)(12) requires that "[a]ll fees payable under section 1920 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." [9] The Debtor's Plan states that all such fees shall be paid on or before the Effective Date, and after confirmation, the Debtor will continue to make requisite payments and file quarterly disbursement reports with the United States Trustee until the entry of the Final Decree or until the case is converted or dismissed. Debtor is current on the obligation to pay quar-

---

**8.** In very general terms, priorities under § 507 are as follows: § 507(a)(1)-administrative expense claims under § 503(b); § 507(a)(2)-gap period claims in involuntary cases; § 507(a)(3)-wage related claims not to exceed $4,000; § 507(a)(4)-employee benefit plan contributions not to exceed $4,000 less claims under § 507(a)(3); § 507(a)(5)-grain/fisherman claims not to exceed $4,000; § 507(a)(6)-deposits not to exceed $1,800; § 507(a)(7)-alimony, maintenance or support claims; § 507(a)(8)-claims for certain taxes; and § 507(a)(9)-claims related to federal depository institutions. *See* 11 U.S.C. § 507(a).

**9.** 11 U.S.C. § 1129(a)(12).

terly fees. The United States Trustee did not object to confirmation.

### Section 1129(a)(13).

Section 1129(a)(13), which addresses the continuation of a debtor's employee retiree benefits,[10] is not applicable to this Debtor, which has no retired employees.

### B. Confirmation Requirements Challenged by ANICO.

### Section 1129(a)(1)—Cure of prepetition lease default

ANICO asserts that Debtor's Plan does not comply with § 1129(a)(1)[11] because it 1) modifies the Lease with respect to percentage rent payments it fails to cure; and 2) fails to provide adequate assurance of cure of the Lease arrearage. Based on the Court's ruling at trial regarding interpretation of the Lease, ANICO's first objection on this basis is overruled as moot, limiting the analysis to the issue of cure of the prepetition lease default. Although the parties have stipulated that, as of the filing date, ANICO had a claim for prepetition arrearages of $375,000, they disagree as to whether ANICO is entitled to postpetition interest on its claim accruing from

the date of filing until payment under the Debtor's Plan.

■ Under § 365(a), a debtor may assume the obligations of an executory contract or unexpired lease subject to the bankruptcy court's approval.[12] However, if there has been a default in the contract or lease, the requirements of § 365(b)(1) come into play. Section 365(b)(1)[13] provides that, in order to assume an executory contract or unexpired lease in which a default has occurred, the trustee must cure the default and provide compensation for pecuniary loss, or provide adequate assurance that cure and compensation will occur promptly.

■ The Debtor contends that there is nothing in the legislative history of § 365(b) that suggests Congress intended to override the restrictions on postpetition interest found in §§ 502(b)[14] and 506(b)[15]. In the alternative, Debtor argues that postpetition interest should be limited to the first 60 days of the bankruptcy proceedings or until May 12, 1999, the date Debtor filed its motion to assume the Lease.[16] ANICO contends that §§ 502 and 506 apply to "claims" against the debtor rather than "defaults" that must be

**10.** 11 U.S.C. § 1129(a)(13).

**11.** Section 1129(a)(1) requires that "[t]he plan complies with the applicable provisions of this title."

**12.** *In re Texscan Corp.*, 976 F.2d 1269, 1271 (9th Cir.1992).

**13.** Section 365(b)(1) states:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
(C) provides adequate assurance of future performance under such contract or lease.

**14.** In general terms, 11 U.S.C. § 502(b)(2) disallows a claim for unmatured interest.

**15.** In general terms, 11 U.S.C. § 506(b) limits postpetition interest to oversecured creditors.

**16.** A debtor or trustee must assume or reject an unexpired lease of nonresidential real property under which debtor is a lessee within 60 days of the order for relief, unless additional time is granted. 11 U.S.C § 365(d)(4).

cured as a condition of assumption under § 365(b), which requires full and complete performance of the unexpired lease.

ANICO cites several cases that support a landlord's entitlement to payment of postpetition interest as a required element to cure a prepetition default.[17] By contrast, the Debtor cites no case law construing § 365(b) in a manner that would prohibit postpetition interest, and the Court is aware of none. Instead, the Debtor relies upon the Supreme Court's decision in *Rake v. Wade* [18], which addressed whether a cure of a "default" of a residential mortgage required payment of interest on the arrearage in a Chapter 13 plan. Debtor attempts to extrapolate the ruling in *Rake* to mean that use of the terms "cure" and "default" under § 365(b) cannot be read without reference to § 506(b); since ANICO is not oversecured, the Debtor argues, it is not entitled to postpetition interest.

■■■ The Court is not persuaded by Debtor's arguments. Upon assuming the Lease, the Debtor becomes liable on the entire lease as if bankruptcy had not intervened.[19] To receive the benefits of the contract, the Debtor must accept all the burdens of the contract as originally agreed.[20] "Cure" ensures that the non-debtor receives full performance on the executory contract or unexpired lease, while still allowing the debtor access to a potentially valuable asset for the estate.

■■■ Although §§ 502(b) and 506(b) adopt the accepted proposition that accrual of interest is suspended as of the date of filing of the petition, the Court finds that such rule applies to *claims* filed against the debtor as distinguished from *defaults* to be cured under assumed executory contracts. As the court stated in *In re J.W. Mays:*

> The cure of a default under an unexpired lease pursuant to 11 U.S.C. § 365 is more akin to a condition precedent to the assumption of a contract obligation by a debtor than it is to a claim in bankruptcy. One of the purposes of Section 365 is to permit the debtor to continue in a beneficial contract provided, however, that the other party to the contract is made whole at the time of the debtor's assumption of the contract.[21]

■■■ This result is further supported by the Code's treatment of rejected leases and contracts. A debtor's rejection of an unexpired lease or executory contract constitutes a breach under § 365(g), which gives rise to a "claim" for damages in favor of the non-debtor party.[22] This "claim" created by the rejection is afforded treatment similar to other unsecured claims. By contrast, assumption of an unexpired lease or executory contract does not give rise to a "claim," implying that the default must be cured in full as a precondi-

---

17. See *In re Entertainment, Inc.,* 223 B.R. 141, 150 (Bankr.N.D.Ill.1998); *In re Eagle Bus Mfg., Inc.,* 148 B.R. 481, 483 (Bankr. S.D.Tex.1992); *In re Diamond Head Emporium, Inc.,* 69 B.R. 487, 495 (Bankr.D.Hawai'i 1987); *In re J.W. Mays, Inc.,* 30 B.R. 769, 772 (Bankr.S.D.N.Y.1983).

18. 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993).

19. See *In re Airlift Intern., Inc.,* 761 F.2d 1503 (11th Cir.1985); *In re Rachels Industries, Inc.,* 109 B.R. 797, 803 (Bankr.W.D.Tenn.1990).

20. See *In re SteelShip Corp.,* 576 F.2d 128, 132 (8th Cir.1978)("It is well settled that the trustee cannot accept the benefits of an executory contract without assuming its burdens as well.").

21. 30 B.R. 769, 771–72 (Bkrtcy.S.D.N.Y. 1983).

22. See *In re National Gypsum Co.,* 208 F.3d 498, 507 (5th Cir.2000).

tion to assumption.[23] Section 2.06 of the Lease requires Debtor to pay interest at the rate of 10% per annum accrued from the due date on any unpaid rent until paid. Thus, to make ANICO whole pursuant to § 365(b)(1), the Debtor in assuming the Lease is required to make payment of interest at the contract rate on the prepetition unpaid rent installment.

The Court also is not persuaded by the Debtor's argument that allowing ANICO postpetition interest is inequitable. Debtor contends that to do so allows a landlord who is already given favored rights under the Code "extraordinary" rights, which gives the landlord an incentive to delay administration of the case for its own benefits. On the contrary, the Code affords the landlord a measure of protection, since it is possible that the lease is not beneficial to the landlord and the landlord lacks any say or authority in the assumption process.[24]

 Finally, ANICO contends that the Allowed Cure Amount must be paid in full on the effective date in order to meet the "prompt cure" requirement of § 365. Prior to the confirmation hearing, Debtor modified its Plan to propose to pay ANICO up to $475,000 on the Effective Date. In the event the Court determines the cure amount to exceed that amount, Debtor proposed to pay ANICO $375,000 on the Effective Date and the balance over one year with interest at 8.5%. At trial, the Plan was orally modified to pay the balance over two years. Subsequently, Karen Miller filed an affidavit stating that VAD had obtained funds to advance Debtor from its operations sufficient to pay ANI-

CO $475,000 on the Effective Date without resorting to obtaining a loan. The Court construes this as a Plan modification that Debtor shall pay ANICO $475,000 on the Effective Date with any balance to be paid over two years.

The Court does not agree with ANICO that the cure amount must be paid in one lump sum.[25] What constitutes "prompt" cure as required by § 365(b)(1)(A) depends upon the facts or circumstances of each case.[26] Debtor's proposal to pay the balance over two years is reasonable in light of the fact that the Lease has approximately 22 years remaining in its term. The Court agrees with ANICO, however, that the cure amount paid over time shall include interest at the contract rate of 10%. The Lease states that interest shall accrue until paid. Because the cure amount will not be paid in full on the Effective Date, interest will accrue at the contract rate of 10%.

ANICO's argument that Debtor's cure is not adequately assured is also overruled. VAD no longer needs to obtain financing to advance $100,000 of the cure amount to Debtor. In light of the testimony of Karen Miller that VAD was prepared to obtain a loan of up to $163,000 to advance to Debtor to finance the cure amount, the Court is persuaded that VAD will be able to advance the additional amount of approximately $63,000.

### Section 1129(a)(2)—Solicitation.

Section 1129(a)(2) requires that the "proponent of the plan complies with the applicable provisions of this title." [27] For reasons set forth in its ruling at trial, the Court concludes that Debtor complied with

---

**23.** *Id.*

**24.** *Id.* at 505–06.

**25.** *In re PRK Enterprises, Inc.,* 235 B.R. 597, 601 (Bankr.E.D.Tex.1999).

**26.** *In re Embers 86th Street, Inc.,* 184 B.R. 892, 900 (Bankr.S.D.N.Y.1995).

**27.** 11 U.S.C. § 1129(a)(2).

the solicitation procedures of § 1125 and therefore the Plan complies with § 1129(a)(2).

**§ 1129(a)(3)—The Plan has been proposed in good faith and not by any means forbidden by law.**

ANICO alleges that there are a number of indicia that Debtor's Plan is not proposed in good faith, including the artificial impairment of Class 3. A number of courts are willing to consider artificial impairment, that is the necessity for and the degree of impairment, in determining whether the plan is proposed in good faith as required by § 1129(a)(3).[28] But, the evidence fails to demonstrate that the impairment of Class 3 was done in bad faith. As will be more fully addressed by the Court in its impairment discussion, *infra,* even under the "economic justification" standard employed in *Windsor,*[29] this Court cannot find that the impairment was artificial or in bad faith or for improper motive. ANICO claims that Class 3 could have been paid in full with interest on the effective date, had Debtor made a smaller initial payment on ANICO's Class 2 claim. This is a disingenuous argument, given that ANICO has consistently taken the position that its Class 2 claim, the arrearage on its Lease, must be cured in a lump sum payment at the time of confirmation, and has objected to Debtor's proposal to pay $475,000 on the effective date, and the balance of the arrearage, if any, over a year with 8.5% interest.

Moreover, the evidence demonstrates that although the Class 3 claims total merely $13,000, Debtor has insufficient cash flow to pay these claims and cure ANICO's claim. In fact, Debtor must rely on an advance of at least $100,000 from its general partner, as well as on a $65,000 distribution from another partnership, in order to cash flow the cure and the payment of Class 3. Furthermore, the Court's determination that ANICO is entitled to postpetition interest on the prepetition arrearage on its Lease, approximately $65,000, leaves even less available cash to pay the Class 3 claims any earlier. The fact that Debtor is not unnecessarily deferring payment of Class 3 claims is further illustrated by the fact that the accrued commissions, fees and expenses of its general partner will not be paid for at least 90 days or later, when cash flow permits.

ANICO alleges that there are other indicia of bad faith in Debtor's plan. In finding a lack of good faith, courts have looked to whether the debtor intended to abuse the judicial process and the purposes of the reorganization provisions.[30] Denial of confirmation for lack of good faith "is appropriate particularly when there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frus-

**28.** *In re 203 North LaSalle Street Ltd. Partnership,* 190 B.R. 567, 593–94 (Bankr.N.D.Ill. 1995), *aff'd.* 126 F.3d 955 (7th Cir.1997), *rev'd on other grounds,* 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999); *In re Hotel Associates of Tucson,* 165 B.R. 470, 475 (9th Cir. BAP 1994); *Equitable Life Ins. Co. of Iowa v. Atlanta–Stewart Partners (In re Atlanta–Stewart Partners),* 193 B.R. 79, 82 (Bankr. N.D.Ga.1996); *In the Matter of Greate Bay Hotel & Casino, Inc.* 251 B.R. 213, 240 (Bankr.D.N.J.2000). But see *In re Beauchesne,* 209 B.R. 266, 275 (Bankr.D.N.H.

1997) [§ 1129(a)(10) allows for any degree of impairment, and once debtor satisfies requirement of § 1129(a)(10), court will not deny confirmation for lack of good faith, based on debtor's appropriate impairment of a class within the bounds of § 1129(a)(10).]

**29.** *In re Windsor on the River Associates, Ltd.,* 7 F.3d 127 (8th Cir.1993).

**30.** *In re Fox,* No. 98–20105–11 (Bankr.D.Kan. Aug. 4, 2000), citing *In re Pikes Peak Water Co.,* 779 F.2d 1456, 1460 (10th Cir.1985).

trate the legitimate efforts of secured creditors to enforce their rights."[31] The focus is on "the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[32] To determine good faith:

> the court looks to the debtor's plan and determines, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code. The plan "must be 'viewed in light of the totality of the circumstances surrounding confection' of the plan [and] ... [t]he bankruptcy judge is in the best position to assess the good faith of the parties' proposals."[33]

Debtor has proposed a Plan which pays all creditors in full and allows equity security holders to keep their interests. ANICO, the only objecting creditor, will be paid in full in 2022, the year its lease is set to expire. Debtor was never in default of its mortgage payment. Its delinquency on Lease payments arose from disputes over the calculation of percentage rents, and on both parties' failure to notice a rent escalation provision in the Lease. Debtor has provided a reasonable and or-

derly repayment of its debts. The Plan may satisfy § 1129(a)(3) "even though the plan may not be one which the creditors would themselves design...."[34]

ANICO cites a number of examples of Debtor's bad faith in proposing the plan.[35] Several examples relate to the fact that the Debtor, its partners, and its general partner remain in possession of the Debtor's operation and assets. But, Debtor's desire and intent to provide a mechanism for it to retain its business interests and assets is consistent with the purposes of the Bankruptcy Code.[36] ANICO also complains that the partners have not contributed more capital, and that VAD, while making no changes in the operation of the shopping center, will nevertheless be paid its management fees in full within 90 days after confirmation. But at trial, VAD agreed to advance at least $100,000 to fund the allowed cure amount of ANICO's lease. Further, VAD has received no management fees, leasing commissions or reimbursements for almost two years. These accrued amounts will not be paid with interest, nor paid any sooner than 90 days after the effective date of the plan, and then only as cash flow permits. Thus, the general partner receives less favorable

31. *In re Pikes Peak Water Co.*, 779 F.2d at 1460.

32. *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir.1984).

33. *Id.* (citations omitted).

34. *In re T–H New Orleans Ltd. Partnership*, 116 F.3d 790, 802 (5th Cir.1997) (citation omitted).

35. Furthermore, ANICO's complaint that the Plan states that unless ANICO accepts the Debtor's offer to purchase ANICO's interest, the arrearage on its lease will not be fully cured on the effective date. But, as amended, the Plan provides that if the Court determines that the Debtor owes additional interest on

the lease above the $475,000, the Debtor will pay that amount over the period of one year.

36. *In re 203 North LaSalle Street Ltd. Partnership*, 190 B.R. 567, (Bankr.N.D.Ill.1995) [not bad faith to propose a plan designed to legally avoid significant tax liabilities of partners, citing *In re James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir.1992) ("It is not bad faith to seek to gain an advantage from declaring bankruptcy—why else would one declare it?") ]. *Aff'd, Bank of America, Illinois v. 203 North LaSalle Street Partnership*, 195 B.R. 692 (N.D.Ill.1996), *Aff'd, Matter of 203 North LaSalle Street Partnership*, 126 F.3d 955 (7th Cir.1997), *Rev'd on other grounds, Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999).

treatment under the Plan than do creditors. Furthermore, there was no evidence that the general partner needs to make operating changes in the shopping center. The occupancy and rental rates, as well as the operating expenses are at appropriate levels, and tenants are satisfied as indicated by their overwhelming acceptance of Debtor's plan.

ANICO also argues that the Plan is proposed in bad faith because it does not provide fair and equitable treatment of ANICO's secured and unsecured claims. The plan crams down ANICO's mortgage, materially alters the Lease, and requires ANICO to "involuntarily finance" the Lease arrearages, "some outstanding since 1983." As the Court discussed above, the delinquency in the Lease was not due to bad faith, but to a dispute over percentage rents and a mutual mistake or unawareness of the rent escalation clause. There simply can be no bad faith in a plan that proposes to modify a claim in the way that the Bankruptcy Code allows: reduction of the contract rate of interest to market rate, extension of the term of the loan and mortgage, and cure of the arrearage.

ANICO also complains that in February and October 1998, the year preceding bankruptcy, Debtor distributed approximately $120,000 to its limited partners; and in December 1998, Debtor redeemed the interests of three limited partners, for a total of $36,000, a premium of $6000 over the initial investments of these three partners. Debtor had not made distributions or redemptions since 1992.

Under the Plan, Debtor waives its right to enforce the avoidance of these transfers; but, as the manager of the general partner testified, the merit of pursuing fraudulent conveyance actions against these aged, retired school teachers, was questionable. These distributions and redemptions were made before ANICO declared default; and there was no showing that Debtor was insolvent at the time. The amounts of the distributions and redemptions do not seem excessive. The partners who redeemed their shares received a total of $6000 more than their initial investment, which is hardly a significant premium for a 25 year investment. Furthermore, as Debtor points out, these transfers did not prejudice ANICO or other creditors, because they are all being paid in full under the Plan.

Moreover, in determining whether the Plan was proposed in good faith, the proper focus, as this Court noted in its *Fox* opinion, is on the Debtor's postpetition conduct and on the plan itself, not on prepetition conduct.[37]

### Section 1129(a)(7)—Best Interest of Creditors test

ANICO objects that the Plan does not satisfy § 1129(a)(7)(A)(ii), which requires that for each impaired class of claims, either each holder accepts the plan, or each holder:

> will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

Section 1129(a)(7) is often referred to as the "best interest of creditors" test.[38] The plain language of § 1129(a)(7) makes clear that this test applies to each

**37.** *In re Fox,* 232 B.R. 229, 236–37 (Bankr. D.Kan.1999).

**38.** *In re Embassy Properties North, Ltd. Partnership,* 196 B.R. 172, 176 (Bankr.D.Kan. 1996).

**30**

creditor rather than to each class of creditors, i.e., the text of the statute specifies "each holder of a claim or interest of such class" shall receive or retain property as required by the statute.[39] "Section 1129(a)(7) requires that each creditor receive under the plan property that has a value, as of the effective date of the plan, that is not less than the amount such creditor would receive if the debtor's assets were liquidated under Chapter 7 of the bankruptcy code."[40]

■ This provision is intended to prevent confirmation of a plan under which a non-accepting, impaired creditor recovers less than if the debtor's property were liquidated under Chapter 7.[41] Of particular importance is the statute's requirement that a creditor receive property *"that is not less than* the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."[42]

■ Generally, creditors do not raise this objection when a plan proposes to pay all creditors in full with interest, as this Plan provides. As will be more fully addressed by the Court in its cram-down analysis discussion, *infra*, the interest rate applicable to the Plan provides secured and unsecured creditors deferred cash payments totaling the allowed amount of their claims as of the effective date. Further, ANICO will be paid postpetition interest on the prepetition arrearage on the Lease payments. Because the best interest of creditors test only requires that a plan not provide less than what creditors

would receive in Chapter 7 liquidation, the instant Plan satisfies § 1129(a)(7). It is impossible for Debtor's creditors to receive more than payment in full with interest in a Chapter 7 liquidation.

In addition, it is clear that in a Chapter 7 liquidation, the unsecured creditors (Class 3) would not receive full payment. In a liquidation, Debtor's primary asset, the Leasehold, would be rejected by the Chapter 7 trustee. The default amount owed on the Lease, which exceeds $500,000, would be deemed an unsecured claim.[43] The only unencumbered asset is a limited partnership interest in College Village, which has little or no liquidation value.[44]

ANICO argues that, because of certain testimony at trial regarding solvency, the Plan does not meet the best interest of creditors test because it does not provide for payment of interest to the Class 3 unsecured creditors. ANICO contends that Karen Miller testified that Debtor was solvent in 1997 and 1998, thus entitling unsecured creditors to interest on their claims. The Debtor responds that the solvency testimony related to solvency as of the date redemption of partnership interests were made, as shown by tax returns for 1997 and 1998, and that the evidence showed the redemptions and distributions were made prior to ANICO's declaration of default in December 1998. The Court has reviewed the testimony and finds it does not show Debtor was solvent on the effective date of the Plan.

---

**39.** 11 U.S.C. § 1129(a)(7).

**40.** *In re Pikes Peak Water Co.,* 779 F.2d at 1460.

**41.** *In re Montgomery Court Apartments of Ingham County, Ltd.,* 141 B.R. 324, 330 (Bankr. S.D.Ohio 1992).

**42.** 11 U.S.C. § 1129(a)(7)(A)(ii)(emphasis added).

**43.** 11 U.S.C. § 365(g).

**44.** Debtor's schedules listed the value of the partnership interest at $50,000.

Despite the Court's ruling at trial that ANICO is not entitled to attorneys fees under § 506(b), ANICO continues to raise the issue, this time in the context of § 1129(a)(7). ANICO maintains that the value of the Leasehold exceeds the amount of its secured claim, thereby entitling it to postpetition interest and attorneys fees under § 506(b). The Debtor's liquidation analysis does not value the Leasehold, instead assuming that the asset would be rejected in a Chapter 7 liquidation. Thus, ANICO concludes, because the Plan does not include attorney fees and costs as part of ANICO's secured claim, ANICO, as the holder of a fully secured claim, receives less under the Plan than it would receive in a hypothetical liquidation under Chapter 7. This argument is without merit and the Court will not revisit the issue of § 506(b).

### Section 1129(a)(8).

Section 1129(a)(8) provides that a plan may be confirmed only if "[w]ith respect to each class of claims or interests—(A) such class has accepted the plan; or (B) such class is not impaired under the plan." [45] However, the requirement of § 1129(a)(8) does not have to be met if the plan does not discriminate unfairly and is "fair and equitable" with respect to each impaired class of claims that has not accepted the plan.[46]

As will be more fully developed below, the Court finds that the Debtor's Plan is fair and equitable pursuant to § 1129(b), and, as a result, the fact that ANICO's Class 2 and 3 did not accept the Plan does not preclude confirmation.

### Section 1129 (a)(10)—Acceptance by at least one impaired, non-insider class.

Debtor contends that there are two accepting classes whose claims are impaired:

Class 3, which consists of allowed unsecured claims of non-insiders; and Class 6, which consists of the limited partners of Debtor. ANICO counters that Class 6 is not impaired and that Class 3 is artificially impaired, further demonstrating that the Plan is not proposed in good faith.

### Class 6

Under the Plan, Class 6, the limited partners, retain their interests, subject to the partnership agreement. Based on the Debtor's cash flow projections, these limited partners will not receive any distributions for the first two to three years of the plan. This, the Debtor asserts, constitutes impairment. Under § 1124, a class of interests is impaired under a plan unless, the plan "leaves unaltered the legal, equitable, and contractual rights" of the holders of such interests.[47]

Under Section 6 of the Limited Partnership Agreement, the limited partners are entitled to share in the net cash flow in proportion to their share of ownership. Net cash flow is defined as income from gross rents and any other source, after payment of all expenses necessary to operate the partnership. If there is no net cash flow, the limited partners are not entitled to a distribution. In fact, the Debtor made no distributions to the limited partners from 1992 to 1997. The Debtor projects insufficient cash flow to make distributions to limited partners, after making plan payments. In fact, VAD, the general partner, which is owed some $125,000 in past due commissions and management fees, is not getting past due or current fees until there is a positive cash flow. Thus, the Plan's failure to make distributions to the limited partners during the first two years of the Plan is no departure from the Debtor's pre-bankrupt-

45. 11 U.S.C. § 1129(a)(8).

46. 11 U.S.C. § 1129(b).

47. 11 U.S.C. § 1124(1).

cy practice, and no alteration of the limited partners' rights under the partnership agreement. Class 6 is not impaired.

**Class 3**

Class 3, the holders of allowed unsecured claims of non-insiders, will be paid in full, 90 days after the Effective Date of the Plan, without interest. This 90 day deferral of payment undisputedly impairs these unsecured claims. ANICO argues that this impairment is unnecessary because Debtor is able to pay Class 3, in full, with interest, on the date of confirmation. Thus, ANICO argues, the Court should disregard the impairment of Class 3 under the Plan, as "artificial impairment" such that the Plan fails to comply with § 1129(a)(10)'s requirement that there be an accepting, impaired class.

The doctrine of artificial impairment recognizes the policy of promoting the consensual reorganization plan, if supported by those who are genuinely impaired or adversely affected by the plan. But, in the aftermath of the 1994 Bankruptcy Reform Act,[48] the doctrine of artificial impairment may no longer be viable. Before the 1994 amendments, § 1124(3) provided that a class of claims or interests was impaired, unless the holder received, on the effective date of the plan, cash

equal to the allowed amount of the claim. Some courts would not deem a claim impaired, however, if the plan could cash out the claim on the effective date, but instead deferred payment. This was viewed as an "artificial impairment." The leading case among those that embraced the doctrine was *In re Windsor on the River Associates Ltd.*,[49] which required that an impairment under a plan have an "economic justification" to avoid being characterized as artificial.

Section 1124 was amended in the 1994 Bankruptcy Reform Act, deleting this exception for "cashed out" claims and interests. This suggests that even claims that are cashed out on the effective date of the plan can nevertheless be impaired within the meaning of § 1124.[50] Since the amendment, some courts continue to apply the doctrine of artificial impairment without addressing the effect of the 1994 amendments.[51] But another line of cases that follows the solid analysis in *In re Atlanta–Stewart Partners*,[52] recognizes that with the deletion of the cash out exception, since classes that receive payment in full on the effective date of the plan are impaired, claims that are cashed out some time after the effective date must be impaired, as well.[53]

**48.** Pub.L.103–394 (Oct. 22, 1994)

**49.** 7 F.3d 127 (8th Cir.1993)

**50.** For an excellent discussion of the effect of the 1994 amendments on the doctrine of artificial impairment, see "Even An Act of Congress Can't Stop the Fight Over Artificial Impairment," by Clemency & Saks, 17–Nov. Am.Bankr.Inst.J. 18 (November, 1998) [1994 amendments a legislative response to *In re New Valley Corp.*, 168 B.R. 73 (Bankr.D.N.J. 1994) which denied vote to a class that plan would cash out on effective date]; and "The Fight Over Artificial Impairment Under § 1129(a)(10): It's Time to Call it Quits," by Clemency & Harris, ABI Journal, Nov. 1995.

**51.** See, e.g., *Beal Bank, S.S.B. v. Waters Edge Ltd. Partnership*, 248 B.R. 668, 690–91 (D.Mass.2000); *In re Memorial Products Co. Inc.*, 212 B.R. 178, 183–84 (1st Cir. BAP 1997); *In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 760 (Bankr.S.D.N.Y.1995); *In re Dunes Hotel Associates*, 188 B.R. 174 (Bankr.D.S.C.1995).

**52.** *Equitable Life Ins. Co. of Iowa v. Atlanta–Stewart Partners (In re Atlanta–Stewart Partners)*, 193 B.R. 79, 82 (Bankr.N.D.Ga.1996).

**53.** See *In re New Midland Plaza Associates*, 247 B.R. 877, 896 (Bankr.S.D.Fla.2000); *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 536 (Bankr.E.D.Tenn.1997); *In re Seasons Apartments, Ltd. Partnership*, 215 B.R. 953

■ Indeed, one court, in *In the Matter of Greate Bay Hotel & Casino, Inc.*,[54] stated that in light of the 1994 amendment, "the concept of artificial impairment is much more difficult to justify," and further that "a claim need not and cannot be artificially impaired." [55] This Court agrees with the *Atlanta–Stewart* and *Greate Bay* decisions, and concludes that Class 3 is impaired under the plan, since it is paid in full, without interest, 90 days after the Effective Date of the Plan. Thus, the Plan satisfies the requirement of § 1129(a)(10) that there be one accepting impaired class.

### Section 1129(a)(11)—Feasibility.

■ The Court must determine if the plan is feasible; that:

Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[56]

This "does not require that substantial consummation of the plan be guaranteed; rather, the plan proponent must demonstrate that there be a reasonable assurance of compliance with plan terms"; [57] and a "reasonable assurance that the plan can be effectuated." [58]

■ The purpose of § 1129(a)(11) is to prevent confirmation of visionary schemes that promise creditors and equity security holders more than the debtor can possibly attain after confirmation.[59] Will the reorganized debtor emerge from bankruptcy solvent and with a reasonable prospect of success? [60]

■ The *Stratford* court noted that courts "have identified the following factors as pertinent [to the determination of feasibility]:

the prospective earnings of the business or its earning power; the soundness and adequacy of the capital structure and working capital for the business which the debtor will engage in post-confirmation; the prospective availability of credit; whether the debtor will have the ability to meet its requirements for capital expenditures; economic and market conditions; the ability of management, and the likelihood that the same management will continue; and any other related factors which would materially reflect on the company's ability to operate successfully and implement its plan."

■ The Court is convinced that Debtor's income and operating expense projections are reasonable, based on the testimo-

---

(Bankr.W.D.La.1997) [unsecured class impaired, paid in full without interest]; *In re Park Forest Development Corp.*, 197 B.R. 388, 395 (Bankr.N.D.Ga.1996).

**54.** 251 B.R. 213, 240 (Bankr.D.N.J.2000)

**55.** *Id.* (citation omitted).

**56.** 11 U.S.C. § 1129(a)(11).

**57.** *In re Stratford Associates Limited Partnership*, 145 B.R. 689, 697 (Bankr.D.Kan.1992) (citing *In re Orlando Investors, L.P.*, 103 B.R. 593, 600 (Bankr.E.D.Pa.1989)). *See also Matter of King Resources Co.*, 651 F.2d 1326 (10th Cir.1980) ("[f]easibility means that the

reorganized company will emerge from the proceeding in a solvent condition with reasonable prospects of financial stability and success").

**58.** *In re Ames*, 973 F.2d 849, 851 (10th Cir. 1992), *cert. denied*, 507 U.S. 912, 113 S.Ct. 1261, 122 L.Ed.2d 658 (1993).

**59.** *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir.1985) (quoting *Matter of Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir.1985)).

**60.** *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir.1985); *In re Stratford Assocs. Ltd. Partnership*, 145 B.R. at 697.

ny of Karen Miller. The Court notes that Debtor has yet to miss a mortgage payment, either pre or postpetition.

ANICO does not question Debtor's projected gross income and operating expenses, but rather, objects that Debtor does not have sufficient funds to cure the default in the Lease. Based on the testimony of Karen Miller, however, the Court is persuaded that the Debtor will be able to pay the cure amount of $475,000 on the Effective Date and the approximate $63,000 balance plus 10% interest over two years as proposed. As of the confirmation hearing, Debtor had a cashier's check from VAD for $75,000; $202,000 in the debtor in possession account; $65,000 check from College Village partnership distribution; and VAD was prepared to obtain a loan in the amount of $100,000 to advance to Debtor. Miller further testified that VAD was prepared to pay ANICO the disputed postpetition interest over two years [61], if the Court so ruled. Although VAD had yet to obtain a loan commitment, Miller had been in contact with a bank regarding the loan and did not think VAD would have a problem obtaining a loan for up to $163,000, using the partnership as collateral and the partners executing guarantees. Miller further testified that if the cure had to be paid over time, VAD would not receive any fees, commissions or payments until the cure was paid in full.

After the hearing, Miller submitted an affidavit supplementing her testimony to confirm that as of October 17, 2000, VAD had obtained funds to advance Debtor from its operations sufficient to pay ANICO $475,000 on the Effective Date without resort to a loan for the additional funds.

The Court construes Miller's affidavit as a Plan modification to pay $475,000 on the Effective Date with the balance, if any, paid over two years. In light of the Court's ruling on postpetition interest, VAD will need to advance an additional $63,000 plus interest at 10%. Based on Miller's testimony, the Court concludes that VAD will have a continuing ability to distribute and loan additional funds to the Debtor as contemplated. In addition, Debtor's cash flow projections [62] show Debtor can cash flow repayment of the cure amount in excess of $375,000. Even with an assumed cure amount of $475,000 being paid on the Effective Date as well as loan repayments to VAD of $100,000, the projections show a positive cash flow of $27,810.73 for the year 2001 and $133,346.47 for 2002.

The Plan has a reasonable assurance of success and is not likely to be followed by liquidation, or the need for further financial reorganization.[63] As such, the Debtor's Plan meets the feasibility requirement.

### Section 1129(b)(2)(A)—Fair and equitable treatment of ANICO's secured claim.

ANICO contends that its secured claim cannot be crammed down under § 1129(b) because under the Plan, it does not receive the present value of the allowed amount of its claim, as of the effective date of the Plan. Under the Plan, Debtor pays ANICO the full amount of its allowed claim, over a period of 22 years, with interest at the rate of 8.5% per annum. ANICO complains that this treatment is not fair and equitable because this effects a nine year extension of the term of the loan, with interest below the contract rate of 10.25%.

---

61. Miller testified at trial that if the cure amount exceeded $475,000, the oral Plan modification would be to pay a lump sum of $375,000 on the Effective Date and pay the balance over two years.

62. Debtor's Exhibit MMM.

63. 11 U.S.C. § 1129(a)(11).

ANICO contends that it is entitled to the contract rate, as an oversecured creditor, citing this Court's decision in *In re Egea.*[64] But, ANICO offered no evidence of the value of its interest in the property securing its claim, nor any evidence concerning the extent of its secured status. Under the Plan, Debtor treats ANICO's claim as fully secured, but not oversecured. ANICO did not object to this treatment, nor file a motion for a determination of the secured status of its claim under § 506(b). Therefore, the Court cannot find that ANICO's Class 2 claim is oversecured. For this reason, at trial, the Court denied ANICO's request for attorney fees under § 506(b). For the same reason, the Court must deny its request for postpetition interest on its secured claim. And, given that its claim is not oversecured, ANICO cannot rely on this Court's ruling in *Egea.*

 In its *In re Hardzog,*[65] decision, the Tenth Circuit held that for purposes of Chapter 12 confirmation, the appropriate discount rate to pay the present value of a secured claim is the "market rate," that being the current market rate of interest for "similar loans" in the region. This Court has since held, in a Chapter 12 case, that such a "similar loan" is a new loan, unaffected by the debtor's bankruptcy; it is neither a workout nor restructured loan.[66] It is a new loan with analogous terms and collateral. The Tenth Circuit has not had ruled whether this "market rate" standard also applies in Chapter 11 confirmations. As this Court concluded in *In re Fox,*[67] the market rate standard applies in Chapter 11, as well as

Chapter 12 because under both chapters, allowed secured claims must be paid in full at present value. The language in both § 1225(a)(5)(B)(ii) and § 1129(b)(2)(A)(i)(II) is virtually the same. In Chapter 12, the holder of the secured claim must receive property that has a value, as of the effective date of the plan, that is not less than the allowed amount of the claim.[68] In a Chapter 11, the holder of the crammed down secured claim must receive deferred cash payments of a value, as of the effective date of the plan, that total at least the allowed amount of the claim.[69] Although the Chapter 11 debtor must pay cash and the Chapter 12 debtor can pay property (which includes cash), whatever the form of payment, in both chapters the creditor must receive at least, or not less than the amount of its allowed claim, at a present value as of the effective date of the plan. Present value as of the effective date of the plan can be determined in the same manner in Chapter 11 and Chapter 12 cases.

 The parties' experts disagreed about whether there were any similar loans in the marketplace to rely on to determine market rate. Debtor's expert, David Farrell, testified that there were no similar loans currently being made in the market. The financing by ANICO was a sale/leaseback transaction that was popular in the 1970s for the flow through tax benefits available to partners in the investment. The Debtor purchased real property to develop a shopping center, then sold the real property to ANICO. ANICO in turn leased the property back to Debtor.

**64.** 167 B.R. 226, 231 (Bankr.D.Kan.1994) [oversecured creditor entitled to contract rate for interest accruing preconfirmation].

**65.** 901 F.2d 858, 860 (10th Cir.1990).

**66.** *In re Zerr,* 167 B.R. 953, 957 (Bankr. D.Kan.1994).

**67.** No. 98–20105–11 (Bankr.D.Kan. Aug. 4, 2000).

**68.** 11 U.S.C. § 1225(a)(5)(B)(ii).

**69.** 11 U.S.C. § 1129(b)(2)(A)(i)(II).

ANICO funded the Debtor's purchase of the real property, securing the note with both a mortgage on its fee interest in the property, as well as a mortgage on Debtor's leasehold interest in the property. The leasehold mortgage is not subordinated to the mortgage on the fee.

Farrell testified that there are no identical loans being made with this structure because the sale-leaseback structure no longer has tax benefits. Farrell therefore considered current loans that have these terms in common with the plan treatment of ANICO's claim: 22 year term of repayment on the note; secured by a leasehold in a nonanchored shopping center; and 22 years remaining on the term of the lease. The primary distinction between the loans Farrell analyzed and the treatment of ANICO's claim is that no loans are being written where the loan is secured by a mortgage on the leasehold interest that is not subordinated to the mortgage on the fee.

This distinction, ANICO's expert opined, means that the interest rate on a loan structured like that in the Plan, would have to be higher, to include the significantly greater risk of lending money to a shopping center developer when the leasehold mortgage securing the note is not subordinated to the fee mortgage. Farrell acknowledged that this structure has attendant risks, that in today's market are not offset by tax benefits, making it a structure wholly unacceptable to today's lender. Farrell testified that no lender today would write a mortgage where there was an unsubordinated leasehold mortgage. The lender would risk having the lessee walk away from the lease in the twilight years of the lease.

But, Farrell explained, it was proper to compare the treatment of ANICO's claim with current fee based mortgage terms, because ANICO is not just a lender secured by a leasehold; it is also the fee owner of the property. In other words, although today's lender would not write such a loan, it is because it would not be willing to lend money when its fee mortgage would not prime a leasehold mortgage. Here, ANICO is both the fee and leasehold mortgagee and has no such concern. Thus, under the Plan, ANICO does not bear the normal risk associated with the sale/leaseback financing structure.

The standard in this Circuit does not require finding that loans are granted on identical terms. Invariably, these claims crammed down in bankruptcy are, in effect, a coerced loan, an animal that does not exist in the market place. Yet, whether the creditor receives the market rate of interest can be determined by reference to similar if not identical loans, characterized by similarities in term and collateral.

As this Court noted in *Zerr*, attempting to quantify the risks of a loan coerced in bankruptcy is a futile exercise.[70] The better practice is to treat it as a new loan to a borrower who is not encumbered by the stigma of bankruptcy and the stain of financial difficulties that lead to bankruptcy. This is possible because through the redemptive process of bankruptcy, the borrower is relieved of the stigma and stain. It emerges as a reorganized debtor with a smaller, more manageable debt load. Its plan is confirmed only if the Court finds that the plan is feasible. This judicial oversight and review serves to ensure a reasonable likelihood of success, despite the debtor's past financial failures. Thus, it is appropriate to analogize this to a new loan to a fresh borrower—in many ways it is. The Plan, proposing to pay this claim at 8.5% interest, is within the range of

70. *In re Zerr,* 167 B.R. at 958.

reasonableness of similar, if not identical, loans.[71] The Court concludes that the market rate for similar loans is 8.5%. This rate is slightly under the range of rates given by ANICO's expert (8.55%–8.80%) and is at the high end of the range of rates given by Debtor's expert.

ANICO's expert, John Parker, was more troubled by the Plan's extension of the term of the fee mortgage for ten years, from 2012 to 2022, such that the mortgage matures in 2022 at the same time that the lease expires. Parker testified that given this particular financing structure, lenders in today's market would not write mortgages for terms that exceed the unexpired term of the lease less ten years. Since this lease expires in 2022, Parker noted, lenders would not be willing to amortize a mortgage longer than 2012.

Parker testified that all but one of the lenders he surveyed indicated that they would write a leasehold mortgage in today's market, for an interest rate in the range of 8.55%–8.80%, but that the term of the mortgage could not exceed the unexpired term of the leasehold mortgage, less 10 years. If the leasehold expires in 2022, lenders would only write a mortgage amortized through 2012, with a balloon. On the other hand, Parker acknowledged that fee based mortgages with terms of 20 to 25 years are available in the marketplace, and that some lenders, particularly conduits with pool financing, would be willing to write a 22 year term mortgage. Although Parker testified that these lenders would require a higher interest rate to compensate for the risk associated with an unsubordinated leasehold mortgage, he acknowledged that his experience in financing leasehold mortgages involved situa-

tions where the fee owner and lessor were not the same entity.

Debtor's expert, Farrell, testified that a 22 year term is reasonable, given that it is common for lenders to write a 30 year mortgage on commercial properties like this one. If ANICO held the leasehold mortgage, but not the ground mortgage, it would have heightened risk; but by holding both, it has no additional risks. Thus, Farrell opined, it was appropriate to compare the term of ANICO's mortgage with the terms of fee based mortgages offered on similar properties in the current marketplace. And, from Farrell's survey of loans on unanchored strip shopping centers in the four county region that includes Debtor's site, lenders are writing 30 year amortization on fee based mortgages.

ANICO further argues that it is not fair and equitable to defer payment of its secured claim over a period of 22 years, while allowing equity to retain its interests and while paying unsecured creditors and insiders within 90 days. This, ANICO argues, shifts the entire risk of postconfirmation default to ANICO. *Hardzog* addresses the appropriate standard for the present value of deferred payments to secured creditors, but does not discuss the appropriate standard for modifications of the term of payment.

Nothing in § 1129(b)(2) prohibits the modification of secured claims by extending or deferring the contract term for repayment. Section 1129(b)(2) represents the minimum standard of what is "fair and equitable." Thus, the reasonableness of the term of payment is appropriately evaluated under the "fair and equitable" test, and, what is reasonable may

---

**71.** See *In re Overland Park Merchandise Mart Partnership, L.P.,* 167 B.R. 647, 660 (Bankr. D.Kan.1994) [J. Pusateri] [the fact that a term is "at the outer edge of the terms of loans being currently made" is insufficient to rebut a finding of present value, so long as the term is within the range of reasonableness.]

be determined with reference to the term of similar loans in the marketplace. Since the marketplace offers loans secured by personalty for terms approximating the useful life of the personalty, courts typically limit modifications to the term of such loans to the extent of the useful life of the collateral.[72]

Given that the marketplace offers loans secured by realty for much longer amortization, courts typically allow debtors to extend the terms of real estate loans, to the extent the term does not exceed what the marketplace offers. For example, 30 year amortization is available for residential and some commercial property; thus, extending a mortgage for another 30 years is often viewed as fair and equitable. If the mortgagee had been able to foreclose, it is likely that it would have financed a new loan for the typical 30 year amortization.[73]

The Court concludes that the Debtor's Plan meets all of the requirements of § 1129 and is confirmable.

## II. ANICO'S PLAN.

The Debtor raises numerous objections to confirmation of ANICO's Plan. Because the Court determines that there are several compelling reasons why ANICO's Plan is not confirmable, the Court declines to address each of Debtor's objections.

ANICO characterizes its proposed Plan as a plan of reorganization. ANICO's Plan states that prior to the Effective Date, the Debtor shall sell, transfer and convey all of its right, title and interest under the ground Lease and the Tenant Leases, including all security deposits and

third party escrowed funds, to ANICO or the qualified offeror of the highest and best cash bid. The transfer of the Tenant Leases shall be free and clear of liens and encumbrances, but the transfer of the ground Lease shall be expressly subject to the leasehold mortgage. The assignee or purchaser of the Debtor's interest in the ground Lease shall assume Debtor's obligations to ANICO under the note, security agreements, assignments of leases/rents, and mortgage. ANICO's Plan calls for a sale of the Debtor's leasehold interest in the shopping center. This sale will be accomplished by an auction; ANICO will credit bid its secured claim, plus additional cash necessary to fund the Plan. Debtor objects that ANICO cannot utilize § 363 to sell the leasehold interest, without first complying with § 365, which governs assumption and assignments of leases.

In the context of the plan under Chapter 11, § 1123(a)(5)(D) provides that a plan may include adequate means for the plan's implementation, including the "sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all of any part of the property of the estate among those having an interest in such property of the estate." ANICO's Plan proposes the sale of the leasehold interest. But, when the debtor is a lessee, its leasehold interest cannot be sold in bankruptcy, unless it is property of the estate. While the leasehold interest is property of the estate by virtue of the broad definition in § 541, the estate does not take title to an unexpired lease until it is affirmatively assumed.[74]

**72.** See *In re White*, 36 B.R. 199, 204 (Bankr. D.Kan.1983) [J. Pusateri].

**73.** See, e.g., *In re James Wilson Assocs.*, 965 F.2d 160 (7th Cir.1992) [approving a 25-year amortization schedule with a seven-year bal-

loon]; and *In re Mulberry Agr. Enterprises, Inc.*, 113 B.R. 30, 32–33 (D.Kan.1990) [J. Rogers] (11 year mortgage, that was past the maturity date, was extended for another for sale to 30 years);

 Under § 365(a), the trustee or debtor in possession has the discretion to assume or reject the lease. No creditor or other party in interest can force the debtor to assume a lease under § 365. And, unless the debtor or trustee assumes the lease in accordance with § 365, neither the debtor nor trustee can assign or sell the lease.[75] The debtor or trustee can assume the lease in accordance with the time limitations of § 365, or under the terms of a plan confirmed under Chapter 11. Otherwise, the lease is deemed rejected.[76] Although § 1123(b)(2) authorizes the assumption and assignment of unexpired leases under a plan, this is subject to § 365(b), which endows the debtor in possession or the trustee with the exclusive right and power to assume the lease, so that it can be assigned.

 Debtor is not asking to assume the lease if ANICO's Plan is confirmed. Here, the Debtor sought assumption of the Lease as a term of its own Plan of reorganization. Since the Debtor in possession has the exclusive power to determine whether and under what circumstances it will accept the Lease, there is no provision to force the Debtor to assume the Lease so that ANICO can assign the Lease and sell the leasehold interest through its own Plan. ANICO has failed to cite, nor is the Court aware of, any authority allowing it to carry out its Plan as proposed.

 Moreover, even if ANICO had authority to assume the Lease, the Court would not permit it as proposed in ANI-CO's Plan. A motion to assume an executory contract or unexpired lease is subject to court approval.[77] The Court must examine the lease and the surrounding circumstances and apply the "best business judgment" test to determine if assumption would be beneficial to the estate.[78] This determination must include a consideration of the effects that assumption would have on the debtor; the implications for the lessor; the benefit or detriment to unsecured creditors; and the significance of the lease to the debtor's reorganization.[79] ANICO's Plan is a liquidating plan, leaving nothing for the Debtor to reorganize and resulting in significant tax consequences for equity security holders. The Court finds that, under the circumstances proposed in ANICO's Plan, assumption of the Lease would not be a good business judgment.

This is a fundamental and fatal flaw in ANICO's Plan. ANICO has no means of selling the leasehold interest, because with the Debtor's rejection of the Lease, there is no leasehold interest to assign and sell. ANICO's Plan contemplated selling the leasehold interest, including the ground Lease (where Debtor is the lessee) and the Tenant Leases (where Debtor is the lessor) at an auction, to the highest bidder. Absent the Debtor's cooperation, ANICO cannot effectuate its Plan. It was through the sale of the leasehold interest that ANICO hoped to generate sufficient funds to pay fees and claims. While ANICO anticipated that if its Plan were confirmed, it would be the successful bidder and would

---

**74.** 2 *Collier on Bankruptcy,* ¶ 365 at 365–43 (15th ed.1993).

**75.** 11 U.S.C. 365(f)(2).

**76.** 11 U.S.C. 365(g)(1)

**77.** 11 U.S.C § 365(a).

**78.** *In re Orion Pictures Corp.,* 4 F.3d 1095, 1099 (2nd Cir.1993); *In re Gateway Apparel, Inc.,* 210 B.R. 567, 570 (Bankr.E.D.Mo.1997).

**79.** *In re Orion Pictures Corp.,* 4 F.3d at 1099.

credit bid [80] its secured claim, it also proposed to pay some of its bid in cash, in an amount necessary and sufficient [81] to pay on the effective date, all statutory fees, administrative claims, priority tax claims, secured [82] and unsecured claims. Lacking any ability to sell the Debtor's leasehold interest, ANICO has nothing to sell and nothing to generate funds for distribution to its creditors.

A less significant, but related problem, is that ANICO has overlooked the fact that it must designate an entity to distribute plan payments. ANICO's Plan requires the Reorganized Debtor to act as disbursement agent, to make plan payments, but without compensation to the Reorganized Debtor for this service. Furthermore, ANICO's Plan requires that the Reorganized Debtor fund a reserve for disputed claims; yet the Plan does not provide that ANICO's bid will include a sum for disputed claims. Apparently, the Reorganized Debtor is expected to generate funds from some other source to fund a

reserve, and then is expected to disburse funds, without compensation.

The Court concludes that ANICO's Plan does not meet the requirements of § 1129 and is not confirmable.

## III. COMPETING PLANS.

 Under § 1129(c), the Court may confirm only one plan.[83] Even if ANICO's Plan was confirmable, which it is not, the Court would confirm Debtor's Plan over ANICO's Plan.

 Although not the exclusive factor in determining which competing plan to confirm, the type of plan is a key component.[84] A reorganization plan is usually preferable to a liquidation plan.[85] The policy of Chapter 11 is to successfully rehabilitate the debtor.[86] The fundamental principles of Chapter 11 include the desire to maximize the value of the estate for the benefit of all creditors, to promote equal distribution among creditors, and to avoid piecemeal, preferential dismemberment of

80. Under § 363(k), a buyer is allowed to credit bid its secured claim. But, it is unclear that ANICO would be entitled to credit bid the amount of the arrearage under the lease, as its plan proposes. Although ANICO now takes the position that the lease arrearage is secured by cross collateralization clauses in its mortgages; before and during trial, ANICO vacillated on the issue of whether the lease arrearage amount was a secured claim. Before trial and during trial, both expressly and impliedly, ANICO took the position that this claim was unsecured. For example, ANICO did not object to the fact that Debtor's plan treated the arrearage as an unsecured amount which had to be promptly cured under § 365. ANICO only objected to the amount of the cure and how "promptly" the cure amount must be paid.

81. ANICO contemplated that the Debtor would have approximately $202,000 in funds from the balance in its debtor in possession bank accounts, that would be available to fund the plan payments, as well.

82. ANICO did not plan to pay its own secured claim on the effective date.

83. Section 1129(c) states: "If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm."

84. Other factors include the treatment of creditors and equity security holders; the feasibility of the plan; and the preferences of creditors and equity security holders. *In re Holley Garden Apartments, Ltd.,* 238 B.R. 488, 493 (Bkrtcy.M.D.Fla.1999).

85. *In re Oaks Partners, Ltd.,* 141 B.R. 453, 465 (Bankr.N.D.Ga.1992).

86. *N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 527, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).

a debtor's assets.[87] The Debtor's Plan is a reorganization plan, under which Debtor would continue to operate its business in the ordinary course, while paying its creditors, including ANICO, in full and allowing equity security holders to keep their interest. ANICO's Plan is a liquidating Plan which serves to benefit ANICO, resulting in a devastating tax obligation to the equity security holders. Debtor's Plan of reorganization is preferable to ANICO's Plan to liquidate.

### CONCLUSION

The Debtor's Plan is confirmed over the objection of ANICO and over the dissenting votes of Classes 2 and 3 for the reasons stated. ANICO's Plan is not confirmable for the reasons stated.

**IT IS THEREFORE ORDERED BY THE COURT** that Debtor's Amended Plan of Reorganization, as modified, shall be CONFIRMED.

**IT IS FURTHER ORDERED BY THE COURT** that confirmation of ANICO's Modified First Amended Plan is DENIED.

This Memorandum shall constitute findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by Rule 9021 of the Federal Rules of Bankruptcy Procedure and Rule 58 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

---

**87.** *In re Lykes Bros. S.S. Co., Inc.,* 207 B.R. 282, 284 (Bankr.M.D.Fla.1997).